Richard J. McVEY, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 73A04–0610–CR–561.

Court of Appeals of Indiana.

March 30, 2007.

436

Joel M. Schumm, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Richard J. McVey (McVey), appeals his conviction for Count I, child molesting, a Class B felony, Ind. Code § 35–42–4–3(a); Count II, child molesting, a Class A felony, I.C. § 35–42–4–3(a)(1); Count III–IV, child molesting, Class C felonies, I.C. § 35–42–4–3(b); and Count V, incest, a Class B felony, I.C. § 35–46–1–3.

We affirm in part, reverse in part, and remand with instructions.

### ISSUES

McVey raises four issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by admitting McVey's statements made during a polygraph examination when the parties had agreed the polygraph would be non-stipulated;

(2) Whether the trial court abused its discretion by excluding evidence of the victim's prior sexual history under Indiana Evidence Rule 412;

(3) Whether the trial court properly denied McVey's Motion for a New Trial based on the victim's recantation after trial; and

(4) Whether several of the special probation conditions for adult sex offenders imposed upon McVey were unconstitutionally vague or otherwise improper as they do not bear a reasonable relationship to McVey's rehabilitation.

## FACTS AND PROCEDURAL HISTORY

J.H., born on October 4, 1990, is the daughter of Mary Herrera and Richard Max McVey (Max). J.H. lived with her mother but would visit with her father every other weekend in Waldron, Indiana. McVey, Max's son and J.H.'s half-brother, was raised by his grandparents and lived in their large home, where Max and his wife also resided.

In 1998, when J.H. was eight years old and McVey was twenty years old, McVey started touching J.H.'s vagina over her clothes with his hand while the two were in McVey's bedroom, laying on the waterbed. After about a year, McVey began touching J.H.'s vagina under her clothes, using his hand, his penis, and sometimes his fingers. J.H. would not say anything because she was scared, thinking it was all her fault. When J.H. was about nine or ten years old, McVey started having intercourse with her, ejaculating "inside [her] private part ... about every other time." (Transcript p. 122). J.H. would tell him to stop, but he never complied.

On August 30, 2001, J.H. became upset at school while her teacher was reading a book that involved child molestation between a father and a daughter. Distraught, she went to the back of the class-

room crying. J.H. confided to the school counselor that her brother had touched her inappropriately over her clothes. The counselor notified Child Protection Services. Detective Rick Isgrigg (Detective Isgrigg) of the Shelby County Sheriff's Department started investigating the allegation. During the ensuing investigation, which spanned several months, the details of the purported molestations evolved.

While investigating J.H.'s claims, Detective Isgrigg spoke with McVey's counsel about his client's willingness to submit to a polygraph. On April 10, 2002, defense counsel wrote to Detective Isgrigg that McVey would be willing to participate in a non-stipulated polygraph and requested the proposed agreement to be sent to him. Two days later, Detective Isgrigg proposed a date and time for the non-stipulated polygraph. However, no agreement was ever executed; rather, the State advised defense counsel that they could execute a form if McVey wanted the polygraph to be stipulated, *i.e.*, with results to be admissible in court, but there was no form to be completed for a non-stipulated polygraph.

On May 28, 2002, McVey appeared at the Indiana State Police Post in Indianapolis to take the non-stipulated polygraph. He was not accompanied by his counsel. The polygraph examiner, unaware of the non-stipulated nature of the exam, had McVey sign a "Polygraph Waiver" form, which included the provision, "[a]nything you say can be used against you in court." (Defendant's Exh. B). Near the end of the polygraph exam, McVey divulged that twelve to fourteen months ago, J.H. had crawled in his bed and he awoke to her stroking his penis. This continued for a minute or a minute and a half until he ejaculated.

On June 17, 2002, the State filed an Information charging McVey with Count I, child molesting, a Class B felony, Ind.Code § 35–42–4–3(a); Count II, child molesting, a Class A felony, I.C. § 35–42–4–3(a)(1); Count III–IV, child molesting, Class C felonies, I.C. § 35–42–4–3(b); and Count V, incest, a Class B felony, I.C. § 35–46–1–3. On February 18, 2003, McVey filed his Motion to Suppress Statements made during his non-stipulated polygraph, which was subsequently denied by the trial court after a pretrial hearing and again at trial. On September 30, 2003 through October 2, 2003, a jury trial was held. At the close of the evidence, the jury found McVey guilty as charged. On December 16, 2003, during a sentencing hearing, the trial court sentenced McVey to six years executed and four years suspended on Count I, thirty years with twenty years executed and ten years suspended on Count II, and four years executed with two years suspended on Count III. The trial court merged Count IV with Count III and Count V merged with Count I. All sentences were to be served concurrently. Additionally, as part of the sentence, the trial court imposed twenty separate "special probation conditions for adult sex offenders." (Appellant's App. p. 230).

On January 14, 2004, McVey filed his notice of appeal. On May 18, 2004, we denied McVey's request to stay the appeal allowing him to pursue a Motion for New Trial based on newly discovered evidence in the trial court. Instead we dismissed the appeal without prejudice and remanded to the trial court for a ruling on McVey's Motion for a New Trial. On May 10, 2004, McVey filed his motion with the trial court. On July 19, and November 3, 2005, the trial court conducted a bifurcated hearing on the Motion for a New Trial and subsequently denied it on January 12, 2006.

McVey now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Non–Stipulated Polygraph

First, McVey contends that the trial court abused its discretion by admitting his statements made during a polygraph examination. Specifically, McVey maintains that because both parties had agreed in advance that the polygraph would be non-stipulated, the agreement amounted to a promise of immunity. As a result of this promise of immunity, McVey claims that he was induced to confess and therefore, his statements should be held to be involuntary and inadmissible.

■ ■ We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Payne v. State*, 854 N.E.2d 7, 13 (Ind.Ct.App.2006), *trans. denied*. An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* However, if a trial court abused its discretion by admitting the challenged evidence, we will only reverse for that error, if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." *Id.* (quoting *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind.Ct.App.2004)). Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted. *Id.*

A polygraph examination is typically conducted in three separate phases. During the pre-test interview, information is gathered from the individual taking the polygraph examination ensuring that the person is a suitable candidate and an explanation is given about the polygraph procedure. Next, the questions are formulated and presented to the individual before the actual polygraph is conducted. At the actual polygraph phase of the examination, the person is attached to the polygraph instrument and the questions that have been previously agreed upon are asked. The instrument then records the individual's physiological responses to the questions. Finally, during the third phase, the post-polygraph interview, the individual is disconnected from the polygraph instrument and questions that might have arisen during the polygraph phase are asked.

McVey is now challenging an admission apparently made during the post-polygraph phase of the examination. Specifically, the record discloses that McVey told the examiner that twelve to fourteen months ago, J.H. had crawled in his bed and he awoke to her stroking his penis. He explained that this continued for a minute or a minute and a half until he ejaculated. At the advice of the examiner, McVey then wrote a letter of apology to J.H., asking that she forgive him for "what happened." (Tr. p. 225). Attempting to convince this court that this admission is inadmissible evidence, McVey maintains that the State's agreement to a non-stipulated polygraph amounted to a promise of immunity. McVey asserts that because he relied on the promise, which he understood to mean that "anything participated in [ ] could not be used against [him]," he was coerced into making the incriminating admission.[1]

■ ■ The courts of this state have repeatedly expressed severe reservations about the reliability of polygraph results.

1. We note an ambiguity in McVey's brief concerning his specific understanding of a non-stipulated polygraph. On p. 6 of his brief, McVey concedes that non-stipulated means "the results would not be admissible at trial," while on p. 9, McVey argues that according to the non-stipulated nature of the polygraph "any information obtained" during the polygraph examination could not be used against him. (Appellant's Br. pp. 6 and 9).

See e.g., *Willey v. State*, 712 N.E.2d 434, 441 (Ind.1999); *Madison v. State*, 534 N.E.2d 702, 704 (Ind.1989) ("the value of polygraph examinations is highly questionable ..."); *Reid v. State*, 267 Ind. 555, 372 N.E.2d 1149, 1152 (1978) ("in any given case, unreliable results may be produced in a polygraph test by influences that cannot be controlled or compensated for by a competent examiner"). Because of its questionable reliability, it is well settled in Indiana that absent a proper waiver or stipulation by the defendant and the prosecuting attorney, the *results* of a polygraph examination are not competent evidence and are inadmissible in a criminal proceeding. *Sanchez v. State*, 675 N.E.2d 306, 308 (Ind.1996); *Kochersperger v. State*, 725 N.E.2d 918, 922 (Ind.Ct.App.2000); *Greenlee v. State*, 477 N.E.2d 917, 919 (Ind.Ct. App.1985) (emphasis added).

However, a distinction must be made between the admissibility of the polygraph's result and the defendant's post-polygraph statements. The majority rule in the United States permits the introduction of voluntary statements made during a polygraph test. *State v. Damron*, 151 S.W.3d 510, 516 (Tenn.2004). Statements are not inadmissible merely because they were made during the course of a polygraph examination. *Id.* Accordingly, a defendant's challenge to the admissibility of a statement made during a polygraph test will be unsuccessful unless the defendant can show that the statement was involuntary. *Id.* Voluntary statements made during the course of a polygraph are admissible as long as they are consistent with other applicable constitutional and evidentiary rules. *Id.*

Valid reasons support admitting into evidence voluntary statements made during the course of a polygraph test. As our Supreme Court has recognized, "admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Furthermore, the fact that a polygraph test is not sufficiently reliable to warrant admission of its results does not undermine the reliability of voluntary statements made by a defendant during a polygraph test. *Damron*, 151 S.W.3d at 517.

■ The Montana Supreme Court similarly explained that equating test results with statements made during the polygraph is a mistake because: "[t]he results of a polygraph examination involve the test-giver's evaluation of responses" while "[s]tatements involve direct responses to questioning and not the evaluation of the credibility in responding." *State v. Smith*, 220 Mont. 364, 715 P.2d 1301, 1310 (1986). The rationale and policies supporting exclusion of polygraph evidence do not support exclusion of voluntary, non-coerced statements made during a polygraph test. Consistent with the overwhelming majority of jurisdictions, we hold that statements made during the course of a polygraph test are not excludable per se as evidence at trials. Current procedures for testing the voluntariness of such statements are adequate to insure that an unreliable statement ·or a statement obtained without a knowing and intelligent waiver of a defendant's rights will not be admissible at trial.

■ Thus in light of this case law, our review will turn on whether McVey's statement was made voluntarily. In support of his contention that his statement was coerced, and thus made involuntarily, McVey focuses our attention on *Ashby v. State*, 265 Ind. 316, 354 N.E.2d 192 (1976). Even though the facts in *Ashby* are widely divergent from the instant case, we find its reasoning instructive. In *Ashby*, the defendant disputed that the trial court erred in admitting incriminating statements made to the police while in custody be-

cause the statements were induced by a promise to mitigate punishment. *Id.* at 193. Unlike McVey, Ashby's statements were not made during a polygraph examination.

The *Ashby* court held that "[i]t is a clear constitutional principle that a confession or admission of the accused is inadmissible if it was obtained by a promise of immunity or mitigation of punishment." *Id.* at 195. Relying on the test to resolve a claim resting on the Self–Incriminating Clause of the Fifth Amendment, our supreme court referred to *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963) (quoting *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897)) stating, "[a] confession in order to be admissible must be free and voluntary: that is, ... not ... obtained by any direct or implied promises however slight." Since *Ashby,* the constitutional principle that a promise of immunity or mitigation of punishment renders a confession inadmissible has been reiterated by the United States Supreme Court and on numerous occasions by Indiana courts. *See, e.g., Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976); *Long v. State,* 422 N.E.2d 284 (Ind.1981); *Turner v. State,* 273 Ind. 627, 407 N.E.2d 235 (1980).

Even though we still adhere to the general principle proposed in *Shotwell* and *Ashby,* our supreme court stipulated an exception in *Bivins v. State,* 642 N.E.2d 928, 940 (Ind.1994), *cert. denied.* Guided by earlier case law, the *Bivins* court held that:

> where a promise of immunity or leniency was not initiated by the State but rather solicited by a defendant as a precondition for making a statement, a defendant manifests the propensity and willingness to make a freely self-determined, voluntary statement not induced by prosecutorial misconduct. Where a promise of leniency results from a defendant's specific request for it as a precondition for making a statement, rather than being initiated by the State, its voluntariness is not impaired thereby.

*Id.* (internal citations omitted).

In the case before us, we find the *Bivins* exception to be controlling. The record discloses that during the course of the investigation, Detective Isgrigg consulted with McVey's counsel about the possibility of McVey submitting to a polygraph. On April 10, 2002, counsel advised Detective Isgrigg that McVey was willing to participate to a "non-stipulated polygraph." (State's Exh. 1). Two days later, Detective Isgrigg notified his agreement to McVey's precondition and set a time and place for the examination. Thus, the State's agreement on a non-stipulated polygraph was precipitated by McVey's specific request. Accordingly, McVey manifested a propensity and willingness to make a voluntary statement but on his specific condition to which the State acceded. Therefore, we find McVey's resulting statement to be freely determined and not induced by any State action. *See id.*

■ Application of the *Bivins* exception notwithstanding, we would still find McVey's statement to be made voluntarily. Unlike the defendant in *Ashby,* McVey was not in custody when he made the incriminating statement during the post-polygraph phase of the examination. He drove himself to the Indiana State Police Post to take a polygraph which was previously set by mutual availability. Prior to the examination, McVey signed a polygraph waiver, advising him in clear and succinct language that

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advise before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed to you before any questioning, if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

(Defense Exh. A). McVey indicated that he understood these rights. The record further establishes that, even though McVey participated to the polygraph without counsel present, he had consulted with his attorney prior to the examination. McVey was free to leave at the end of the examination. Charges were not filed until three weeks later.

■ Moreover, when McVey made the statement at issue, the polygraph examiner was not interrogating him but was merely asking questions that had arisen during the technical phase of the examination. Confronting a suspect with polygraph results is not coercive or unreasonable. *Wyrick v. Fields,* 459 U.S. 42, 48, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982). Doing so in this case certainly did not overcome McVey's free will because an explanation had been provided to him prior to the test and, pursuant to the waiver, he was at liberty to stop the questioning at any time or not to respond at all. The evidence in the record simply does not establish, nor even suggest, that the potentially incriminating statement resulted from police coercion or inducement, rather than from McVey's free will. Therefore, we conclude that the trial court did not abuse its discretion in admitting McVey's statement during trial.

## II. *J.H.'s Prior Sexual History*

■ Next, McVey asserts that the trial court improperly prohibited the introduction of J.H.'s prior sexual history. McVey posits that because another man had been charged with molesting J.H. in July of 2002, he should have been allowed to question J.H. about any sexual contacts with this other man. Thus, by limiting his cross-examination of J.H., the trial court violated his Sixth Amendment right to confront witnesses.

■ Indiana's Rape Shield Law, which is embodied in Ind. Evidence Rule 412, precludes the introduction of a victim's prior sexual conduct, except under very specified and narrow circumstances:

(a) In a prosecution for a sex crime, evidence of the past sexual conduct of a victim or witness may not be admitted, except:

(1) evidence of the victim's or of a witness's past sexual conduct with the defendant:

(2) evidence which shows that some person other than the defendant committed the act upon which the prosecution is founded;

To show a violation of the Confrontation Clause with respect to this issue, our supreme court has determined that the defendant must demonstrate that he was prohibited from engaging in otherwise appropriate cross-examination "designed to show a prototypical form of bias on the part of the witness, and thereby from showing the jury facts from which it could appropriately draw inferences relating to the witness's reliability." *Davis. v. State,* 749 N.E.2d 552, 554 (Ind.Ct.App.2001), *trans. denied* (quoting *Rubalcada v. State,* 731 N.E.2d 1015, 1021 (Ind.2000)). We note that the purpose of the Rape Shield law is to encourage the reporting of sexual assaults and to prevent victims from feel-

ing as though they are on trial for their sexual histories. *Id.* at 555. Therefore, trial judges are afforded wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness's safety or interrogation that is repetitive or only marginally relevant. *Id.*

To support his contention of error, McVey relies heavily on this court's opinion in *Davis*, 749 N.E.2d at 554. There, the trial court admitted into evidence a physical examination of a twelve-year-old girl, which demonstrated that the girl had not been sexually active on the night of the alleged rape, but had been sexually active on prior occasions. *Id.* at 553. During an offer to prove, conducted outside the purview of the jury, the young girl admitted to having sexual intercourse with others at the age of twelve. *Id.* However, the trial court did not allow this latter testimony pursuant to Evid. R. 412. *Id.* On review, we reasoned that the exclusion of such testimony unfairly bolstered the girl's testimony, "inasmuch as the inference arises that, because [the girl] was accurate in stating that sexual contact had occurred, as disclosed by the physical examination, she also must have been accurate in stating that [the defendant] was the perpetrator of the charged offenses." *Id.* at 555–56. Because there could have been another possible source for the acts of molestation against the young girl, the *Davis* court held that the trial court had abused its discretion by excluding the challenged evidence from the jury. *Id.* at 556.

*Davis* is distinguishable from the present case. Specifically, here, McVey was charged with five counts of child molest and incest, committed between the dates of October 1998 and August 2001. After making the allegations against McVey,

J.H. was subjected to a medical examination on February 1, 2002. Pursuant to this physical examination, Dr. Roberta Hibbard (Dr. Hibbard) concluded that J.H. had a sharp angular notch in the hymenal tissue which was very unusual for an eleven-year old girl and consistent with sexual assault. Later, and separate from the instant case, the State filed a molestation charge against Jesse Whitfield (Whitfield), alleging that he molested J.H. in June of 2002, approximately four months after J.H.'s medical examination by Dr. Hibbard and approximately a year after the molestations by McVey occurred.

Prior to trial, the trial court granted the State's motion in limine excluding all evidence of J.H.'s past sexual conduct. At trial, during J.H.'s cross-examination, McVey, outside the presence of the jury, asked the trial court to lift the motion in limine. He argued that the allegations involving Whitfield were so close to J.H.'s physical examination that he should be able to present information of Whitfield's alleged molestation to the jury. The trial court refused to revisit its earlier ruling.

Also, McVey offered his father's testimony, who indicated that he had previously been called to the home of J.H.'s mother in 1998 or 1999 to deal with some inappropriate actions. At his arrival at the house, J.H.'s mom told Max that J.H. was on Whitfield shoulders with "her privates in his face." (Tr. p. 340). Additionally, McVey offered this trial testimony as part of an offer to prove that Whitfield had access to J.H. as early as 1998 or 1999 and requested a cross-examination of J.H. with regard to the timing and extent of her sexual contact with Whitfield. Again the trial court refused.

Unlike *Davis*, the challenged evidence does not show that Whitfield, as a possible other perpetrator, molested J.H. between October 1998 and August 2001. Even

though Max, as a defense witness, testified to alleged inappropriate conduct between J.H. and Whitfield in this period, his own testimony nevertheless downplays the incident's importance as he continued to testify that J.H.'s mother tends to exaggerate. Rather, lifting the trial court's motion in limine and allowing J.H. to be cross-examined on alleged sexual contact with Whitfield would place us squarely within the purview of *Steward v. State*, 636 N.E.2d 143 (Ind.Ct.App.1994), *aff'd*, 652 N.E.2d 490 (Ind.1995).

In *Steward*, we addressed the Confrontation Clause issue and the risk of partial corroboration and stated that

> the risk of partial corroboration arises when the State introduces evidence of the victim's physical or psychological condition to prove that sexual contact occurred and, by implication, that the defendant was the perpetrator. Once admitted, such evidence may be impeached by the introduction through cross-examination of *specific evidence* which supports a *reasonable inference* and tends to prove that the conduct of a perpetrator other than the defendant is responsible for the victim's condition which the State has placed at issue. [ ][W]e emphasize that both the necessity for and the constitutional right to such cross-examination are limited to these specific and narrow circumstances and clearly do *not permit a general inquiry into the victim's sexual past or allow the defendant to posit hypothetical perpetrators*, an inquiry which would violate the Rape Shield Statute.

*Id.* at 149 (emphasis added). Here, it is clear that the record lacks the specific evidence required to support a reasonable inference that some person other than McVey had committed the acts upon which the prosecution is based. The only particular evidence of Whitfield's alleged sexual interaction with J.H. occurred early July 2002, well after J.H. had identified McVey as her abuser and her physical examination had been conducted. Allowing cross-examination merely because of Max's testimony relating to a single incident, which he did not witness, could not remember the specific date, and its importance he downplayed, would hand McVey a fishing rod to go after hypothetical perpetrators of a young girl. *See id.*

Thus, based on the evidence before us, we conclude that the trial court did not abuse its discretion by refusing McVey to cross-examine J.H. with regard to her prior sexual history. Consequently, we refuse to disturb the trial court's ruling.

### III. *Motion for a New Trial*

■ Thirdly, McVey claims that the trial court abused its discretion by denying his Motion for a New Trial based on newly discovered evidence pursuant to Ind. Trial Rule 60(B)(2). He asserts that J.H.'s recantation of her allegations that McVey had molested her warrants a new trial. Our review of a trial court's decision on a motion for relief from judgment pursuant to T.R. 60(B) is limited to determining whether the trial court abused its discretion. *Hartig v. Stratman*, 760 N.E.2d 668, 671 (Ind.Ct.App.2002), *reh'g denied, trans. denied.* Thus, we will reverse the judgment only if it goes against the logic and effect of the facts or the trial court has misinterpreted the law. *Id.* We will give the trial court's order substantial deference. *Id.*

The record establishes that during the hearing on the motion, McVey presented an affidavit signed by J.H. on August 11, 2004 in which she declares that "Jimmy and I have never had sex with each other and he never touched me inappropriately." (Defendant's Exh. A). The affidavit was drafted and sworn at McVey's counsel's office. Max testified that he obtained legal

custodianship of J.H. in June of 2004. He admitted that, on August 11, 2004, he drove J.H. to the attorney's office and was in her company the entire time. Also, Max's wife testified that J.H. had confided in her that McVey did not do anything to her, and that J.H. had "more or less brought it up." (New Trial Hearing Tr. p. 45).

At the continued hearing on the motion, the State introduced an affidavit signed by J.H. on May 13, 2005 in which she swore to have testified truthfully at trial and not to have understood the previous recantation affidavit. In her testimony, she elaborated that her father, Max, had taken her to McVey's attorney's office and told her that the lawyer was "there to help me and [McVey]." (New Trial Hearing Tr. p. 68). She stated that the attorney asked her to sign certain papers but she did not know what they were. J.H. added that she never told McVey's counsel that nothing had happened between McVey and her.

■ Our supreme court has enunciated nine criteria for admission of newly discovered evidence. New evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial. *Carter v. State,* 738 N.E.2d 665, 671 (Ind.2000) (citing *Fox v. State,* 568 N.E.2d 1006, 1007 (Ind.1991)). We analyze these nine factors with care, as "the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Id.* The burden of showing that all nine requirements are met

rests with the defendant. *Taylor v. State,* 840 N.E.2d 324, 330 (Ind.2006).

We agree with the State that McVey fails at least two of the required nine prongs. First, we find that J.H.'s first affidavit would be used merely to impeach her trial testimony. Unlike McVey, we do not conclude that the affidavit would destroy or obliterate the testimony upon which a conviction was obtained. *See State v. McCraney,* 719 N.E.2d 1187, 1190 (Ind.1999). Instead, the affidavit would merely serve to cast doubt on J.H.'s trial testimony. As such, it would not destroy or obliterate her earlier testimony, but rather place her credibility at issue, a matter that is reserved for the jury.

■ Second, we cannot say that the recantation affidavit was worthy of credit. "Whether a witness' testimony at a postconviction hearing is worthy of credit is a factual determination to be made by the trial judge who has the opportunity to see and hear the witness testify." *Id.* at 1191. Here, the trial court clearly did not consider the affidavit to be worthy of credit. Any value the recantation affidavit might have is seriously limited by J.H.'s original trial testimony, her subsequent affidavit signed on May 13, 2005, and her testimony during the motion hearing in which she essentially claimed to have been coerced by her father to sign the recantation affidavit. Based on our deferential standard of review, we decline to reverse the trial court's denial of McVey's motion for a new trial. *See id.*

### IV. *Probation Conditions for Adult Sex Offenders*

■ Lastly, McVey contends the imposition of several special probation conditions for adult sex offenders because they are unconstitutionally vague or otherwise improper as they do not bear a reasonable relationship to his rehabilitation.

Although the trial court imposed twenty special probation conditions, McVey singles out six specific conditions for our review. A trial court enjoys broad discretion when determining the appropriate conditions on probation. *Smith v. State*, 779 N.E.2d 111, 117 (Ind.Ct.App.2002), *trans. denied.* However, this discretion is limited by the principle that the conditions imposed must be reasonably related to the treatment of the defendant and the protection of public safety. *Id.* Where the defendant challenges a probationary condition on the basis that it is unduly intrusive on a constitutional right, we evaluate that claim by balancing the following factors: (1) the purpose to be served by probation, (2) the extent to which constitutional rights enjoyed by law-abiding citizens should be enjoyed by probationers, and (3) the legitimate needs of law enforcement. *Id.*

### A. *Pornographic or Sexually Explicit Materials*

■ Special condition five provides that McVey

shall not possess or view any pornographic or sexually explicit materials, including but not limited to: videos, television programs, DVDs, CDs, magazines, books, Internet web sites, games, sexual devices or aids, or any material which depicts partial or complete nudity or sexually explicit language or any other materials related to illegal or deviant interests or behaviors . . .

(Appellant's App. p. 230). McVey complains that this restriction is vague and, at the same time, too sweeping to survive a constitutional attack.

With respect to McVey's argument that this condition impermissibly infringes upon a constitutional right, we reiterate that such rights may be restricted or denied altogether if the balancing of factors indicates it is warranted. *Smith*, 779 N.E.2d

at 117. Although there is no evidence that McVey's offense directly involved sexually explicit material, it cannot be denied that sexual arousal is one of the possible effects of viewing such material. We do not know whether McVey's arousal from such a source would ultimately endanger another child, but the possibility does not strike us as so remote as to render this condition improper. *See id.* Moreover, restricting exposure to a potential source of temptation would, in all probability, aid in McVey's rehabilitation. *See id.*

■ Nevertheless, we agree with McVey that this particular condition of probation is unreasonably vague. A probationer has a due process right to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison. *U.S. v. Guagliardo*, 278 F.3d 868, 872 (9th Cir.2002) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

In *Fitzgerald v. State*, 805 N.E.2d 857, 866 (Ind.Ct.App.2004), we were confronted with the exact same probation condition on pornographic or sexually explicit material. On direct appeal, Fitzgerald argued, in part, that the terms "pornographic or sexually explicit materials" and "deviant interests or behaviors" were unconstitutionally vague. *Id.* We stated that even though the term pornographic or sexually explicit materials included an attempt at specification by referring to particular materials, it did "not save the probation condition from the attack as overbroad." *Id.* at 867. With reference to the phrase "deviant interest or behaviors," the *Fitzgerald* court indicated that "it is [not] a safe harbour from being successfully attacked as unconstitutionally vague." *Id.* As there is nothing included in the condition which indicates what is meant by the phrase "deviant interests or behaviors," we concluded that

more specificity is required to inform the defendant what is considered appropriate social norms and what may be considered a deviation from those norms. *Id.*

Regardless of the State's request to overrule *Fitzgerald's* holding, we still find *Fitzgerald* to be valid law in this jurisdiction. As a result, we remand to the trial court with instructions to set out this prohibition with specificity. In this regard, we strongly encourage the trial court to note the remand observations made in *Smith* where we stated that in defining pornographic and sexually explicit material with more specificity,

> [t]he definition of 'child pornography' found in the federal statute might be a useful tool in this endeavor. *See* 18 U.S.C. § 2256(8). And the trial court might prohibit Smith from possessing any materials that fall under the definition of "obscene matter." *See* Ind.Code § 35–49–2–1. But whatever the court decides, the condition should be narrowly tailored to the goals of protecting the public and promoting [McVey's] rehabilitation.

*Smith,* 779 N.E.2d at 118.

### B. *Traveling Alone After 10:00 p.m.*

■ Next, McVey disputes the imposition of special condition 9, which provides: "[y]ou shall not travel alone after 10:00 p.m. (including but not limited to: driving, walking, bicycling, etc.) unless given permission by your probation officer." (Appellant's App. p. 231). McVey contends that this condition reaches beyond what is reasonably necessary to rehabilitate him.

■ Sexual predators prey upon those to whom they have access. *See Carswell v. State,* 721 N.E.2d 1255, 1259 (Ind.Ct. App.1999). Conditions of probation that reduce the access to potential victims are reasonable. *Id.* While we are aware that many communities have curfews preventing children from leaving their homes in the late evening hours, truancy is prevalent. And, as the State aptly pointed out, there are many rural communities that have not imposed curfews. Also, we note that McVey is not completely prohibited from traveling after 10:00 p.m. Instead, he is given a choice: he can travel either accompanied by others or alone if given prior permission. Therefore, we find the probation condition to be sufficiently clear and specific, with a reasonable relationship to the protection of the public. *See Fitzgerald,* 805 N.E.2d at 866.

### C. *Notifying Dating Companions*

■ This contested special condition 10 states that

> you shall notify your probation officer of your establishment of a dating, intimate and/or sexual relationship. You shall notify any person with whom you are engaged in a dating, intimate or sexual relationship of your sex-related conviction(s). You shall not engage in a dating, intimate or sexual relationship with any person who had children under the age of 18 years.

(Appellant's App. p. 231). We first note that McVey is not prohibited from establishing and maintaining relationships with adults. Rather, he is merely required to report such activity. Nevertheless, McVey now contests this condition because it is insufficiently clear as to what conduct could result in his being returned to prison as there are widely varying opinions on what constitutes a "date."

We agree. On the one hand, the State argues that "date," as stipulated in the probation condition, amounts to a "prearranged social activity with another individual whether innocuous or sexually related." (State's Br. p. 24). Applying this interpretation would result in McVey hav-

ing to report the most mundane activities, like going out for coffee with a friend. This would amount to an unreasonable burden. On the other hand, McVey interprets the condition as limited to intimate occasions and sexual contact. However, McVey's understanding would make the insertion of "date" in the probation condition superfluous as "intimate and/or sexual relationships" are clearly listed as a separate category. Accordingly, because the condition is not sufficiently clear to inform McVey of what conduct is prohibited, we remand to the trial court to reconsider and clarify this condition with greater specificity.

### D. *Contact with Persons under the Age of Eighteen*

■ McVey asserts that special condition 13 is overreaching and does not serve a legitimate rehabilitative goal. The condition reads:

> You must never be alone with or have contact with any person under the age of 18. Contact includes face-to-face, telephonic, written, electronic, or any indirect contact via third parties. You must report any incidental contact with persons under age 18 to your probation officer within 24 hours of the contact.

(Appellant's App. p. 231). Specifically, McVey's complaint focuses on the prohibition of "incidental contact." Comparing it to an outing at McDonalds, McVey asserts that if he is "handed his food by a young man who looks to be eighteen but could be seventeen, a call to his probation officer ... would seemingly be required." (Appellant's Br. p. 22). He maintains that if he leaves his home, such incidental contacts will likely be repeated many times throughout any given week.

As we have observed before, child molesters molest children to whom they have access. *See Carswell,* 721 N.E.2d at 1259. Accordingly, probation conditions that re-

duce the potential for access to children are reasonable. *Id.* · Therefore, preventing McVey from being alone with children under eighteen years of age and from participating in activities involving children under eighteen will certainly reduce such access. *See Smith,* 779 N.E.2d at 117. Nevertheless, we agree with McVey that the additional prohibition on "incidental contacts" is overly broad. Thus, we remand to the trial court with instruction to alter the condition prohibiting McVey from being alone or have contact with any person under the age of eighteen.

### E. *Presence at Parks or Other Locations where Children might be present*

■ Special condition 14 states that McVey "shall not be present at parks, schools, playgrounds, day care centers, or _____ (other specific locations where children are known to congregate in your community)." (Appellant's App. p. 231). In *Fitzgerald,* 805 N.E.2d at 868, we held an identical condition to be invalid.

As in *Fitzgerald,* the condition at bar is part of a generic form in which the trial court marked the conditions of probation that would apply to McVey. *See id.* As noted by the blank line in the condition, the form had some extra spaces where the trial court could write in additional conditions or expand certain restrictions. Here, the trial court made no additional restrictions or notations on the form.

Furthermore, as stated by the *Fitzgerald* court, we have previously determined that phrases similar to "other specific locations where children are known to congregate in your community" have been found to be unconstitutionally vague. *Id.* We agree with *Fitzgerald* that although one may rely upon common sense to conclude that the phrase implicitly applies to the entire condition because children are

known to congregate at parks, schools, playgrounds, and day care centers; however, it is quite possible and likely that children and teenagers do not congregate at all parks. *See id.* Given that the condition does not specifically include a restriction on any location where children are known to congregate, and that the restriction may be read to prohibit McVey from every park, even those where children do not congregate, we remand to the trial court to reconsider and clarify this condition, especially the use of the parenthetical notation.

### F. *Computer Access*

■ Lastly, McVey contests specific condition 19 with regard to computer access. This condition reads:

> You shall not use any computer with access to any on-line computer service at any location (including your place of employment) without prior approval of your probation officer. This includes any internet service provider, bulletin board system, e-mail system or any other public or private computer network. You shall not possess or use any data encryption technique or program.

(Appellant's App. p. 232). Specifically, McVey alleges that because his offense did not involve any sort of computer or online media, the prohibition is not reasonably related to his rehabilitation.

We disagree. We find that the limitation on McVey's access to the internet is reasonably related to his successful reintegration into the community. Clearly, accessing prohibited material is easily accomplished with a computer, and for that reason computer access would provide a temptation of such a magnitude that exposure to it would not be in the best interest of McVey's rehabilitation. *See also Smith,* 779 N.E.2d at 118 (Ind.Ct.App.2002). This is so because the internet defies boundaries and offers unlimited access to people,

including children. *See, e.g., U.S. v. Zinn,* 321 F.3d 1084, 1093 (11th Cir.2003) (noting that some child molesters reach their victims through the internet), *cert. denied.* This access is often subtle to children and undetected by most parents. Restricting a child molester's access to this communication medium, therefore, serves to protect the public and to prevent future criminal activity.

Moreover, we note that the condition in question does not completely prohibit McVey from using the internet, which has increasingly become a vital means of communication in the business world. Instead, it simply requires him to receive prior approval from his probation officer to use the internet. Thus, the trial court did not err in restricting McVey's access to computers and online computer services.

### CONCLUSION

Based on the foregoing, we conclude that (1) the trial court properly admitted McVey's voluntary statements made during a polygraph examination; (2) the trial court properly excluded evidence of the victim's prior sexual history under Indiana Evidence Rule 412; (3) the trial court properly denied McVey's Motion for a New Trial; and (4) several of the special probation conditions for adult sex offenders imposed upon McVey are not sufficiently clear to inform him of what conduct is prohibited, and thus, we remand to the trial court to reconsider and clarify these conditions with greater specificity.

Affirmed in part, reversed in part, and remanded with instructions.

KIRSCH, J., and FRIEDLANDER, J., concur.