**FOR PUBLICATION**



ATTORNEY FOR APPELLANT:

**JAMES H. VOYLES, JR.**
**TYLER D. HELMOND**
Voyles Zahn & Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TYLER A. WHITE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 90A04-1111-CR-621 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE WELLS CIRCUIT COURT
The Honorable Brian D. Hutchison, Special Judge
Cause No. 90C01-0910-MR-1

**November 21, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

# STATEMENT OF THE CASE

Tyler White appeals his conviction for murder following a jury trial. He presents the following issues for our review:

1.  Whether the trial court erred when it found that certain testimony was admissible under Evidence Rule 804(b)(5), the "forfeiture by wrongdoing" hearsay exception.

2.  Whether Indiana's feticide enhancement statute, Indiana Code Section 35-50-2-16, is unconstitutional.

3.  Whether the trial court erred when it did not judicially supply a mens rea element to the feticide enhancement statute.

4.  Whether the trial court abused its discretion when it excluded evidence that the victim had previously had a miscarriage, which White proffered to support his defense to the feticide enhancement.

We affirm.[1]

# FACTS AND PROCEDURAL HISTORY

White and Amy Meyer began dating in 2005, got married, and, in June 2008, Amy gave birth to a son, M.W. White was verbally abusive to Amy throughout their relationship, and the couple separated shortly after M.W.'s birth. In July, Amy moved in with her boyfriend, Lee Flueckiger. White filed for divorce shortly thereafter.[2]

White and Amy shared custody of M.W. pending the provisional custody hearing, which was scheduled for October 28, 2009. White continued his verbal abuse of Amy, and he and Amy frequently argued regarding the parenting time schedule. Amy began using her cell phone to record the custody exchanges, and she intended to use those

---

[1] We heard oral argument in this case on September 25, 2012.

[2] The State avers that Amy filed for divorce, but the dissolution pleadings submitted as evidence at White's trial show that White was the petitioner and Amy was the respondent.

recordings as evidence against White at the provisional custody hearing. During one exchange when Flueckiger was present, White "pointed his finger at [Flueckiger] like he was shooting a gun." Transcript at 554. In March 2009, White purchased a handgun, and he carried that gun on his person most of the time thereafter.

On October 27, one day before the provisional custody hearing, Amy arrived at White's parents' house, where White was living, to pick up M.W. White asked Amy whether he could keep M.W. for an additional thirty minutes, but Amy denied that request and told White that she wanted to leave with M.W. immediately. An argument ensued, and White shot Amy twice in the abdomen. White then threw Amy's cell phone on the ground and shot it. White went inside and washed his hands before calling 911.

When police arrived, they found two unloaded handguns on the ground near Amy. One gun belonged to White, and the second gun was later determined to belong to White's close friend Matt Reinhard. Reinhard had reported that gun stolen in April 2009. White told police that Amy had pointed a gun at him and that he had shot her in self-defense. Paramedics arrived and found that Amy had no pulse. Attempts to resuscitate her were unsuccessful, and Amy, who was eleven or twelve weeks pregnant at the time, died of the gunshot wounds. The fetus died as a result of Amy's death.

Deputy Scott Holliday with the Wells County Sheriff's Department arrested White and transported him to the Wells County jail. Detective James Paxton advised White of his Miranda rights, which White waived, and Detective Paxton proceeded to take White's statement. White maintained that Amy had pointed a gun at him and that he had shot her in self-defense.

At the jail, White was placed in a padded room, as a precaution, while he was being monitored for suicidal ideations. After two or three days, Diane Sweat, a registered nurse working at the jail, examined White to determine whether he could be moved into the jail's general population. Guard Taneka Garrett was also present. In the course of that interview, White, referring to Amy, said, "The bitch got what she deserved." Id. at 407.

The State charged White with murder. In preparing for trial, the parties asked the trial court to conduct a hearing to determine the admissibility of certain evidence under Evidence Rules 404(b) and 804(b)(5). The parties stipulated to the following evidence to be analyzed by the trial court under Evidence Rule 804(b)(5):

1. Stephanie Dubach
   a. Amy told Stephanie that:
      i. Tyler told Amy that he didn't like her body (during marriage)
      ii. He didn't want the baby (prior to baby's birth in June 2008)
      iii. Tyler said that Amy was a fucking whore (post-separation)
      iv. Tyler told Amy that she was going to get what she deserved (post-separation)
      v. She told Tyler that she was recording their meetings (post-separation)
      vi. He repeated everything for the recording (post-separation)
      vii. When she went to pick up [M.W.] with Lee, Tyler made his hand in the shape of a gun and pointed it at them as if to shoot them (post-separation)

2. James Fryback
   a. Amy told Jim that
      i. Tyler was "pushing her around"

3. Camy Bishop
   a. Amy told Camy that

4

     i.      Tyler had pushed her and hit her causing a bruise (statement made May 2009 re: incident of 2007)

     ii.     That she was going to start recording exchanges (post-separation)

4. Hayley Murray
   a. Amy told Hayley that:
      i. When she went to pick up [M.W.] with Lee, Tyler made his hand in the shape of a gun and pointed it at them as if to shoot them (post-separation)
      ii. Tyler said that he wanted to get a gun; and [sic] (post-separation)
      iii. Tyler said that he wanted to go into the woods with just him and Amy (post-separation)
      iv. She was recording exchanges (post-separation)

5. Mike Meyer
   a. Amy told Mike that:
      i. She could only staying [sic] because she was pregnant (Spring 08?)
      ii. Tyler would call her names and send her horrible texts (post-separation)
      iii. She was recording exchanges (post-separation)
         1. He was with her one time when she videotaped exchange

6. Tara Mattern
   a. Amy told her that:
      i. Tyler told her that "you will get what you deserve["] (post-separation)
      ii. Amy told her that she was recording him

7. Karen Kaehr
   a. Amy told her that:
      i. She was ready to move on (post-separation)

8. Amber Toland
   a. Amy told her that:
      i. Showed her text messages where he called her names (post-separation)
      ii. She was going to try to record him at exchanges (post-separation)

9. Lee Fl[ue]ckiger

a. Amy "confirmed" that Tyler made a gun motion (post-separation)
b. Amy told him that:
    i. Tyler was verbally abusive to her (post-separation)
    ii. Tyler said that he was never to come on his property (post-separation)
    iii. That she was recording exchanges (post-separation)
c. He heard recording of an exchange where Tyler acknowledged he was being recorded (post-separation)[3]

10. Paul Wickey
a. Amy told him that:
    i. Naples[, Florida] incident – threw drink in her face (statement made in 2008 re: 2006 incident)
    ii. Tyler called her names (post-separation)
    iii. That she was recording exchanges (post-separation)

Appellant's App. at 588-89. Following a hearing, the trial court ruled that all of the evidence included in the joint stipulation was admissible at trial. In particular, the trial court found that:

1. The State of Indiana demonstrated by a preponderance of the evidence that Amy White is unavailable to testify as the result of the defendant engaging in wrongdoing that was intended to and did procure her unavailability for the purpose of preventing her from attending or testifying at a hearing; therefore, the statements made by Amy White as set forth in the Stipulation of Statements Subject to 804(b)(5) Analysis are admissible as an exception to hearsay.

2. Each of the acts and/or statements as set forth in the Stipulation of Statements Subject to 804(b)(5) Analysis and as set forth in the Evidence of Agreement of the Parties and Stipulation of the Parties as to Evidence of 404(b) Material is admissible as being probative of the defendant's motive and intent at the time of the offense alleged and the probative value of the evidence set forth therein is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence.

---

[3] Flueckiger's testimony that White made a shooting gesture towards Flueckiger and that he had heard a recording of White's acknowledgement that Amy was recording the custody exchanges was not hearsay. See Ind. Rule of Evidence 801(d)(2).

6

Appellant's App. at 703.

In January 2011, the State filed a second count, feticide. And in May, the State filed a Notice of Intent to Seek Enhanced Penalty Based Upon Termination of Human Pregnancy under Indiana Code Section 35-50-2-16 (the "feticide enhancement statute"). The State then dismissed the feticide count.

The jury trial was bifurcated between the murder count and the feticide enhancement. The jury found White guilty of murder and, in the second phase of the trial, the jury found that the State had proved beyond a reasonable doubt that the murder had caused the death of Amy's fetus. The trial court entered judgment accordingly and imposed a sentence of sixty years for murder, enhanced by ten years for the feticide enhancement, for an aggregate executed sentence of seventy years. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Evidence Rule 804(b)(5)

White first contends that the trial court "misapplied" Evidence Rule 804(b)(5), the "forfeiture by wrongdoing" hearsay exception. Evidence Rule 804(b) enumerates exceptions to the hearsay rule where a declarant is unavailable as a witness, and Rule 804(b)(5) permits a "statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness for the purpose of preventing the declarant from attending or testifying." White maintains that the State did not prove by a preponderance of the evidence that his purpose in shooting Amy was to prevent her from testifying.

"[Indiana Evidence Rule 804(b)(5)] was not in the original Evidence Rules, but

7

was adopted by amendment effective [July 1,] 2009." Robert L. Miller, Jr., 13 Indiana Practice § 804.205 at 144 (3d Ed. 2011 pocket part). In 2008, prior to the adoption of Rule 804(b)(5), this court held that "a party, who has rendered a witness unavailable for cross-examination through a criminal act, including homicide, may not object to the introduction of hearsay statements by the witness as being inadmissible under the Indiana Rules of Evidence." Roberts v. State, 894 N.E.2d 1018 (Ind. Ct. App. 2008), trans. denied. But Rule 804(b)(5) goes further and requires that the party procured the unavailability of the declarant for the purpose of preventing the declarant from attending or testifying. Because there is no reported Indiana case addressing the rule, the application of the rule to the circumstances in this case is an issue of first impression.

Evidence Rule 804(b)(5) is patterned on the federal rule, Federal Evidence Rule 804(b)(6), and we look to federal case law for guidance in interpreting and applying this hearsay exception. In United States v. Dhinsa, 243 F.3d 635, 653-54 (2nd Cir. 2001), cert. denied, 534 U.S 897 (2001), the Court of Appeals for the Second Circuit explained the forfeiture by wrongdoing hearsay exception as follows:

> prior to finding that a defendant waived his confrontation rights with respect to an out-of-court statement by an actual or potential witness admitted pursuant to Rule 804(b)(6), the district court must hold an evidentiary hearing outside the presence of the jury in which the government has the burden of proving by a preponderance of the evidence that (1) the defendant (or party against whom the out-of-court statement is offered) was involved in, or responsible for, procuring the unavailability of the declarant "through knowledge, complicity, planning or in any other way;" and (2) the defendant (or party against whom the out-of-court statement is offered) acted with the intent of procuring the declarant's unavailability as an actual or potential witness. See Fed. R. Evid. 804(b)(6) advisory committee note to subdivision (b)(6) (adopting the preponderance of the evidence standard required under Fed. R. Evid. 104(a) "in light of the behavior the new Rule 804(b)(6) seeks to discourage"); accord [U.S. v.]

8

Houlihan, 92 F.3d [1271,] 1280 [(1st Cir. 1996)] ("We . . . hold that when a person who eventually emerges as a defendant (1) causes a potential witness's unavailability (2) by a wrongful act (3) undertaken with the intention of preventing the potential witness from testifying at a future trial, then the defendant waives his right to object on confrontation grounds to the admission of the unavailable declarant's out-of-court statements at trial."). The government need not, however, show that the defendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defendant "was motivated in part by a desire to silence the witness." Houlihan, 92 F.3d at 1279[.] As Rule 804(b)(6) and our prior precedents do not require such a finding of sole motivation, we decline to read one into the rule. "Further, in order to avoid the admission of facially unreliable hearsay, the district court should undertake a balancing of probative value against prejudicial effect in accordance with Fed. R. Evid. 403." [U.S. v.]Miller, 116 F.3d [641,] 668 [(1997)] (internal quotation marks omitted). "The district court's findings after a hearing will not be disturbed unless they are clearly erroneous, and we are particularly hesitant to disturb the court's determinations when they are based on its evaluation of the credibility of witnesses." [U.S. v.]Thai, 29 F.3d [785,] 814 [(1994)].

(Some emphases added). Here, the parties agree that a preponderance of the evidence standard applies. See also Indiana Practice § 804.205 (2011 pocket part at 144).

Following a hearing, the trial court found that the State had proven by a preponderance of the evidence that Amy was unavailable to testify at White's murder trial "as the result of the defendant engaging in wrongdoing that was intended to and did procure [Amy's] unavailability for the purpose of preventing her from attending or testifying at a hearing[.]"[4] Appellant's App. at 702. And the trial court found that the probative value of the 804(b)(5) evidence outweighed the danger of unfair prejudice to White by its admission. Because the only evidence submitted for the trial court's review at the admissibility hearing was by a paper record, including the stipulation of evidence for the trial court's consideration, we are in the same position as the trial court and

_____

[4] White makes no argument under the confrontation clause of the Sixth Amendment to the United States Constitution. Accordingly, the United States Supreme Court's holding in Giles v. State, 554 U.S. 353 (2008), which applies to a deceased declarant's testimonial statements, is inapposite here.

"therefore are able to independently assess" the evidence relevant to the Rule 804(b)(5) determination "without invading the province" of the trial court. See Bunch v. State, 964 N.E.2d 274, 293 (Ind. Ct. App. 2012), trans. denied; see also State v. Bisard, 973 N.E.2d 1229, 1237 (Ind. Ct. App. 2012), trans. pending. We note, however, following the federal case law, that a clearly erroneous standard of review would apply where a trial court considers evidence by live testimony. See Dhinsa, 243 F.3d at 654.

Again, White contends that the State failed to prove by a preponderance of the evidence that White procured Amy's unavailability for the purpose of preventing her from testifying. The State asserted two arguments on this issue at the admissibility hearing. First, the State alleged that White killed Amy to prevent her from testifying at his murder trial. Second, the State alleged that White killed Amy to prevent her from testifying at the provisional custody hearing, which was scheduled for the day after the shooting. We hold that the preponderance of the evidence supports a determination that White killed Amy to prevent her from testifying at the provisional custody hearing. Accordingly, we need not address the State's first theory.

In support of his contention that White did not kill Amy to prevent her from testifying at the provisional custody hearing, White asserts that such a theory "ma[kes] no sense." Brief of Appellant at 12. White points out that the hearing was "provisional" and would not have been the final custody determination. Id. And White states that there was no evidence that he had wanted to continue the hearing. Finally, White maintains that "unlike an essential witness in a criminal case, [White] could not automatically prevail in the provisional custody hearing by killing Amy. To the contrary, shooting

10

[M.W.]'s mother would almost certainly result in [M.W.'s] placement somewhere else." Id. at 12-13. We are not persuaded.

The State presented ample evidence that White and Amy had fought bitterly over custody of M.W. since their separation. Immediately preceding the shooting, White had requested an additional thirty minutes of parenting time with M.W., which Amy denied. An argument ensued, which ended with White shooting and killing Amy. In her petition for a provisional custody order, Amy had requested full custody of M.W. pending the final decree. At the 804(b)(5) hearing, the State presented evidence that Amy had been using her cell phone to record custody exchanges to use at the provisional custody hearing and that White was aware of those recordings. Moreover, during his statement to police after the shooting, White admitted that he had "mocked" Amy just prior to the shooting because she had frequently pointed out his conduct that would "look bad" for him "in court." State's Exhibit 13. And the State maintains that, had White prevailed in his claim of self-defense, White would likely have been granted full custody of M.W.

Thus, a preponderance of the evidence supports a reasonable inference that White's intent in killing Amy was, at least in part, to keep her from testifying against him at the provisional custody hearing, which was to take place the next day. The evidence shows that the couple's custody battle was the source of the ongoing conflict between them. The fact that the conflict escalated one day before a custody hearing is substantial evidence of White's intent when he shot Amy. Contrary to White's assertion on appeal, it is entirely plausible, if not likely, that had White succeeded in his self-defense to the murder charge, White, as the only surviving biological parent, would have been granted

11

sole custody of M.W.[5]  Under Evidence Rule 804(b)(5), because White was at least partially motivated to kill Amy to prevent her from testifying at the provisional custody hearing, the trial court properly allowed the challenged hearsay evidence.  See A.J. Stephani & Glen Weissenberger, Weissenberger's Indiana Evidence Courtroom Manual, 320 (2012-13 ed.) (Evidence Rule 804(b)(5) hearsay exception applies where offering party shows party engaged in wrongdoing that resulted in witness's unavailability and that one purpose was to cause the witness to be unavailable at trial).  And we hold that the probative value of the 804(b)(5) evidence outweighed the danger of unfair prejudice to White.

### Issue Two:  Constitutionality of the Feticide Enhancement Statute

Indiana Code Section 35-50-2-16 provides:

(a) The [S]tate may seek, on a page separate from the rest of the charging instrument, to have a person who allegedly committed or attempted to commit murder under IC 35-42-1-1(1) or IC 35-42-1-1(2) sentenced to an additional fixed term of imprisonment if the [S]tate can show beyond a reasonable doubt that the person, while committing or attempting to commit murder under IC 35-42-1-1(1) or IC 35-42-1-1(2), caused the termination of a human pregnancy.

(b) If the person is convicted of the murder or attempted murder in a jury trial, the jury shall reconvene to hear evidence in the enhancement hearing. If the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall hear evidence in the enhancement hearing.

(c) If the jury (if the hearing is by jury) or the court (if the hearing is to the court alone) finds that the [S]tate has proved beyond a reasonable doubt that the person, while committing or attempting to commit murder under IC 35-42-1-1(1) or IC 35-42-1-1(2), caused the termination of a human

---

[5]  Moreover, it is irrelevant whether White, intending to shoot and kill Amy, had considered the consequences of his actions beyond preventing Amy from testifying against him at the provisional hearing.  In other words, we reject White's contention that this theory "made no sense" in light of White's argument that M.W. would likely be placed with someone other than White after the shooting.

pregnancy, the court shall sentence the person to an additional fixed term of imprisonment of not less than six (6) or more than twenty (20) years.

(d) A sentence imposed under this section runs consecutively to the underlying sentence.

(e) For purposes of this section, prosecution of the murder or attempted murder under IC 35-42-1-1(1) or IC 35-42-1-1(2) and the enhancement of the penalty for that crime does not require proof that:

> (1) the person committing or attempting to commit the murder had knowledge or should have had knowledge that the victim was pregnant; or

> (2) the defendant intended to cause the termination of a human pregnancy.

(Emphases added).

Here, the State presented evidence that Amy was pregnant at the time of the shooting and that her death caused the death of the fetus. And the jury found that the State had proved beyond a reasonable doubt that White, "while committing or attempting to commit Murder, did cause the termination of a human pregnancy." Appellant's App. at 996. Accordingly, pursuant to Indiana Code Section 35-50-2-16, the trial court enhanced White's sixty-year sentence by ten years, for an aggregate sentence of seventy years.

On appeal, White contends that the feticide enhancement statute "violates constitutional and historical legal protections" because of the absence of a mens rea element.[6] Brief of Appellant at 16. In support of that contention, White points out that "a culpable state of mind has long been recognized as an essential hallmark of criminal

---

[6] As the State points out, White does not specify any constitutional provision to support his contention on this issue in his brief on appeal, contrary to the requirement of Indiana Appellate Rule 46(A)(8)(a). White's failure notwithstanding, we consider the historical context of the feticide enhancement statute.

13

justice." Id. at 17. But he acknowledges that "a consensus and comprehensive constitutional application of mens rea has remained elusive." Id. at 18. White then examines case law where offenses lacking a mens rea element were challenged, but he identifies no clear precedent to support his contention here. Indeed, in Morissette v. United States, 342 U.S. 246, 260 (1952), the United States Supreme Court was unwilling to "delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." And White acknowledges that since Morissette, the Supreme Court "has done little to clarify the constitutional contours of mens rea as a due process requirement." Brief of Appellant at 19. Neither does White address the fact that the crime of which he was convicted, murder, does have a mens rea element and that the additional sentence of feticide was merely an enhancement to his sentence for the murder conviction.

White further observes that the "constitutional and historical implications for an absence of mens rea in a sentencing enhancement [are] also unclear." Id. at 20. Citing Apprendi v. New Jersey, 530 U.S. 466 (2000), White points out that "traditional due process protections, including the right to a jury determination, [are] applicable to any finding that expose[s] the defendant to greater punishment than that authorized by the jury's verdict." Brief of Appellant at 20-21. Still, White concedes that Apprendi "did not address the constitutional contours of mens rea in sentencing enhancements." Id. at 21.

In State v. Moss-Dwyer, 686 N.E.2d 109, 111-12 (Ind. 1997), our supreme court set out our standard of review applicable to constitutional challenges to penal statutes:

> Indiana courts have consistently supported the proposition that "[t]he nature and extent of penal sanctions are primarily legislative considerations . . . ."

14

Person v. State, 661 N.E.2d 587, 593 (Ind. App. 1996), trans. denied.[] Our separation of powers doctrine requires we take a highly restrained approach when reviewing legislative prescriptions of punishments. While legislative decisions do not completely escape review, "judicial review of a legislatively sanctioned penalty is very deferential." Person, 661 N.E.2d at 593 (citing Conner[v. State], 626 N.E.2d [803,] 806 [(Ind. 1993)]). We will not disturb the legislative determination of the appropriate penalty for criminal behavior except upon a showing of clear constitutional infirmity. Steelman[ v. State], 602 N.E.2d [152,] 160 [(Ind. Ct. App. 1992)]. As the court stated in Person, "When considering the constitutionality of a statute, we begin with the presumption of constitutional validity, and therefore the party challenging the statute labors under a heavy burden to show that the statute is unconstitutional." 661 N.E.2d at 592 (citing Jackson v. State, 634 N.E.2d 532, 535 (Ind. App. 1994)). A court is not at liberty to set aside the legislative determination as to the appropriate penalty merely because it seems too severe. Conner, 626 N.E.2d at 806; Clark v. State, 561 N.E.2d 759 (Ind. 1990).

(Emphasis added).

Here, the feticide enhancement statute expressly provides that neither a defendant's knowledge of his victim's pregnancy nor his intent to kill the fetus is required. Thus, the legislature's intent on this issue is clear, and the State need not prove a defendant's mens rea when it seeks a sentencing enhancement for feticide. Indeed, the principle underlying this statute derives from the nature and circumstances of the crime aggravator. In McCann v. State, 749 N.E.2d 1116, 1120 (Ind. 2001), which was decided prior to the adoption of the feticide enhancement statute, our supreme court held that

pregnancy is similar to the infirmity or age of the victim in that the defendant's knowledge of these circumstances is not necessary for them to qualify as aggravating. To be sure, knowledge of the victim's vulnerability adds to the culpability of the perpetrator, but aggravating circumstances turn on the consequences to the victim as well as the culpability of the defendant. This understanding of aggravating circumstances comports with the Black's Law Dictionary definition of aggravation: "[a]ny circumstance attending the commission of a crime . . . which increases its guilt or enormity or adds to its injurious consequences."

15

(Emphasis added, citations omitted).

Moreover, the feticide enhancement statute is not an outlier. Indiana Code Section 35-50-2-9(b)(12) provides that a defendant who murders a child less than the age of twelve can be punished by death regardless of the defendant's knowledge of the victim's age. In Stevens v State, 691 N.E.2d 412, 432-33 (Ind. 1997), cert. denied, 525 U.S. 1021 (1998), our supreme court rejected the defendant's contention that the State had to prove his specific knowledge that the victim was under the age of twelve under Indiana Code Section 35-50-2-9(b)(12), which is silent on whether such knowledge is required. The court distinguished between Indiana Code Section 35-50-2-9(b)(6), which authorizes the State to seek the death penalty or life imprisonment without parole where a defendant has actual knowledge that his victim is a law enforcement officer, and Section 35-50-2-9(b)(12). In particular, the court observed that "[s]uch a rule reflects the legislature's policies of both increased protection of young children and harsher punishment for those who prey upon them." Id. at 432-33.

Here, the feticide enhancement statute reflects the legislature's policies of both increased protection of fetuses and harsher punishment for those who, by murdering a pregnant woman, cause the death of a fetus. White has not satisfied his heavy burden to show that the feticide enhancement statute is unconstitutional for lack of a mens rea requirement.

**Issue Three: Judicially-supplied Mens Rea**

White contends that a mens rea element "should have been judicially supplied" to require his knowledge that Amy was pregnant when he shot her to qualify for the feticide

16

enhancement. Brief of Appellant at 23. White maintains that "Indiana has long recognized that mens rea may be required, 'whether specified by the wording of the statute or not.'" Id. (quoting Gregory v. State, 291 N.E.2d 67, 68 (Ind. 1973)). But each of the precedents White relies on involves a statute that is silent on the issue of mens rea. Here, as we have already discussed, the feticide enhancement statute expressly states that no mens rea is required. We decline to add a mens rea requirement which the legislature has specifically excluded from the statute. Accordingly, White's contention on this issue is without merit.

### Issue Four:  Excluded Evidence

Finally, White contends that the trial court abused its discretion when it excluded evidence that Amy had previously suffered a miscarriage. White intended to present that evidence during the enhancement phase of his trial to support his defense theory that his actions did not cause the death of Amy's fetus. The State counters that the trial court properly excluded that evidence as irrelevant, and we must agree.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. McVey v. State, 863 N.E.2d 434, 440 (Ind. Ct. App. 2007), trans. denied. An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. Id. Here, when the State moved in limine to exclude evidence of Amy's prior miscarriage, White's defense counsel stated, "I have no problem with that[.]" Transcript at 764. But, in a subsequent side bar, White's defense counsel sought the trial court's permission to ask the State's expert witness a question regarding Amy's prior miscarriage, and the court denied that request.

17

On appeal, in support of his contention that he should have been permitted to raise the issue of Amy's prior miscarriage to show that she had a higher risk of miscarriage in this case, White cites to a law review article. But White made no offer of proof to the trial court, and, regardless, he has not shown that Amy's prior miscarriage had "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would [have been] without the evidence." See Ind. Evidence Rule 401. We agree and cannot say that the trial court abused its discretion when it excluded evidence of Amy's prior miscarriage.

**Conclusion**

We hold that the trial court properly allowed hearsay testimony regarding statements Amy had made to others prior to her death under Indiana Evidence Rule 804(b)(5). The preponderance of the evidence shows that White killed Amy, at least in part, for the purpose of preventing her testimony at the provisional custody hearing. The feticide enhancement statute, Indiana Code Section 35-50-2-16, is not unconstitutional. Also, because the legislature expressly excluded a mens rea requirement from the feticide enhancement statute, we will not judicially supply such a requirement. Finally, the trial court did not abuse its discretion when it excluded evidence that Amy had previously suffered a miscarriage.

Affirmed.

KIRSCH, J., and MAY, J., concur.