Arthur B. HARRIS, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 32A01–0705–CR–219.

Court of Appeals of Indiana.

April 16, 2008.

Transfer Denied June 26, 2008.

Cynthia P. Helfrich, Casey Law Offices, Brownsburg, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

KIRSCH, Judge.

Arthur B. Harris appeals his convictions for attempted voluntary manslaughter [1] as a Class A felony and carrying a handgun without a license [2] as a Class A misdemeanor. He appeals raising the following relevant issues:

I. Whether the trial court properly instructed the jury as to the elements of attempted voluntary manslaughter when it failed to instruct that they must find that Harris had the intent to kill in order to convict him of attempted voluntary manslaughter;

II. Whether the State presented sufficient evidence to support his conviction for attempted voluntary manslaughter; and

III. Whether the trial court abused its discretion when it allowed a video of Harris at the crime scene and statements made at that time into evidence.

We affirm in part, reverse in part, and remand for retrial.

### FACTS AND PROCEDURAL HISTORY [3]

Harris and Mark Gann met in the summer of 2005 at work, and the two became friends. Approximately a month after they met, Gann needed help paying his rent and asked Harris if he wanted to move into his extra bedroom. Harris agreed and moved into Gann's two-bedroom trailer in Hendricks County.

On January 14, 2006, Gann picked up his teenage son, T.G. and returned home, stopping to get a bottle of rum on the way. Once home, Gann fixed himself a drink, took some pain medication, and went to bed. Gann gave Harris permission to drink the rum. At approximately 9:30 p.m., T.G.'s best friend, D.S., came over and began playing cards with T.G. and Harris. Harris began drinking the rum, and when he continued to drink it, T.G. told him that Gann did not want Harris to drink it all. Harris then started arguing with the boys and "talking about respect

---

1. *See* IC 35–42–1–3; IC 35–41–5–1.

2. *See* IC 35–47–2–1; IC 35–47–2–23(c).

3. Oral argument was heard on this case on March 19, 2008 in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

and just started going off." *Tr.* at 72. Harris then "flipped out," grabbed D.S. by the neck, and slammed him against the wall. *Id.* at 72, 126. D.S. struck Harris in the face approximately five or six times. T.G. intervened and tried to calm the situation, asking Harris why he had done that. *Id.* at 128. Harris said that he was trying to teach him about respect, and T.G. responded that Harris did not need to do so because that was his father's job. *Id.* Harris then put his hands on T.G.'s face, and after T.G. pushed Harris's arm down, he smacked T.G. in the face.

D.S. ran into the room where Gann was sleeping to wake him up. Harris yelled for Gann to "get up" and "come whop my ass." *Id.* at 129. Gann was angry that Harris was fighting with the boys and told Harris to leave the house. Harris refused and began fighting with Gann. Gann finally pushed Harris out of the front door and down the steps. As Gann was shutting the door, he saw Harris reach behind his back. Approximately two seconds after Gann closed the door, Harris fired a shot through the center of the door. Harris then yelled something like, "I shot one through the door[,] and I've got four in the chamber, now you want to 'F' with me." *Id.* at 102. Gann took the boys out onto the back porch, and D.S. called 911. He told the dispatcher, "You've got to send somebody now ... he's threatening to kill us." *Id.* at 68.

The police arrived shortly after the 911 call. The first officer on the scene saw Harris standing at the foot of the deck in front of the front door, yelling and screaming. Harris told the officer that he did not have a gun, but the officer saw him throw a gun to the ground. *Id.* at 163–64. When the gun was recovered, it was determined to be a .357 revolver with three live rounds and one spent round in the cham-

ber. Harris did not have a license to carry the handgun on his person.

Harris was handcuffed and placed at the curb in front of the residence. Harris was intoxicated, but coherent when the officers arrived. He was read his *Miranda* rights by a second officer, and when asked if he understood his rights, Harris initially said, "yeah, yeah, yeah, he [knew] his rights" and cursed at the officer. *Id.* at 193. After Harris was read his rights, he continued to scream and yell, so the officer turned on his car video camera to capture Harris's actions. At the beginning of the recording, the officer reminded Harris that he had been given his rights. Later in the video, Harris was again asked if he understood his rights, and he shouted that he did not "understand nothing." *Ex.* 22.

On January 17, 2006, the State charged Harris with Count I, attempted murder, a Class A felony; Count II, carrying a handgun without a license, a Class C felony; and Count III, criminal recklessness with a deadly weapon, a Class D felony. An initial hearing was held, and the omnibus date was set for March 23, 2006. On October 30, 2006, the State filed amended Count I, attempted voluntary manslaughter, a Class A felony; amended Count II, carrying a handgun without a license, a Class A misdemeanor; and amended Count III, criminal recklessness, a Class C felony. No contemporaneous objection was made to these amendments. On January 9, 2007, the State filed a second amended Count I, which was allowed over Harris's objection on the following day.

A jury trial began on February 5, 2007. Harris objected to both the Preliminary and Final Jury Instructions that outlined the elements the State had to prove for Count I, attempted voluntary manslaughter. Preliminary Instruction No. 5 stated:

> The statute defining the offense of voluntary manslaughter, which was in force

at the time of the offense charged, reads as follows:

A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Class B felony.

The offense is a Class A felony if it is committed by means of a deadly weapon.

The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. The State has conceded the existence of sudden heat by charging voluntary manslaughter instead of murder.

A person attempts to commit voluntary manslaughter when, acting with the culpability required for commission of voluntary manslaughter, he engages in conduct that constitutes a substantial step toward commission [of] voluntary manslaughter. The crime of attempted voluntary manslaughter is a Class B felony. However, the crime of attempted voluntary manslaughter is a Class A felony if committed by means of a deadly weapon.

Before you may convict the defendant of attempted voluntary manslaughter, the State must have proved each of the following elements beyond a reasonable doubt.

1. The Defendant
2. acting with the culpability required to commit the crime of voluntary manslaughter, which is defined as:
· to knowingly or intentionally
· kill
· Mark Gann
· by means of a deadly weapon
3. did shoot a firearm through the front door of Mark Gann's residence, where Mr. Gann was standing after shutting the door on Mr. Harris, almost striking Mr. Gann
4. which was conduct constituting a substantial step toward the commission of the crime of voluntary manslaughter.

If the State fails to prove each of these elements beyond a reasonable doubt, you should find the Defendant not guilty of attempted voluntary manslaughter, a Class A felony as charged in Count 1. If the State does prove each of the elements beyond a reasonable doubt, you may find the Defendant guilty of attempted voluntary manslaughter, a Class A felony.

*Appellant's App.* at 20–21. Final Instruction No. 5 reiterated the definition and elements of the offense using the same language. The jury returned guilty verdicts on all three counts. The trial court only entered judgment on the attempted voluntary manslaughter and carrying a handgun without a license convictions. Harris now appeals.

## DISCUSSION AND DECISION

### I. Jury Instruction

■ Generally, jury instructions are within the sole discretion of the trial court, and we will reverse the trial court's decision only for an abuse of that discretion. *Brown v. State*, 830 N.E.2d 956, 966 (Ind. Ct.App.2005). "Jury instructions are to be considered as a whole and in reference to each other, and we will not reverse the trial court's decision as an abuse of discretion unless the instructions as a whole mislead the jury as to the law of the case." *Id.* (citing *Carter v. State*, 766 N.E.2d 377, 382 (Ind.2002)). To be entitled to a reversal, the defendant must affirmatively show that the erroneous instruction prejudiced his substantial rights. *Gantt v. State*, 825 N.E.2d 874, 877 (Ind.Ct.App.2005).

Harris argues that the trial court erroneously instructed the jury as to the elements of attempted voluntary manslaughter because it failed to instruct the jury that it must find he had the intent to kill in order to convict him of attempted voluntary manslaughter. He contends that, in a prosecution for attempted voluntary manslaughter, the State must prove that: (1) the defendant had the specific intent to kill; and (2) the defendant took a substantial step toward the commission of voluntary manslaughter. Harris claims that the elements of attempted murder and attempted voluntary manslaughter are identical, and therefore, a jury must be instructed to find a specific intent to kill in attempted voluntary manslaughter cases.

Harris relies on *Spradlin v. State,* 569 N.E.2d 948 (Ind.1991) for his argument. In that case, our Supreme Court held that a jury instruction setting forth the elements that must be proven in order to convict a defendant of attempted murder must inform the jury that the State must prove beyond a reasonable doubt that the defendant, acting with the intent to kill the victim, engaged in conduct which was a substantial step toward such killing. *Id.* at 950. Our Supreme Court stated that, "in order to attempt to commit a crime, one must intend to commit that crime while taking a substantial step toward the commission of the crime." *Id.* at 951. In that case, the jury was not instructed that such proof was required, and the defendant's conviction was reversed. *Id.*

Subsequently, our Supreme Court decided *Richeson v. State,* 704 N.E.2d 1008, 1010 (Ind.1998). In that case, the Court stated that attempted murder was a special case, which deserved special treatment. It reasoned that the "higher sentencing range for attempted murder *in combination with* the ambiguity involved in the proof of that crime" justified the

*Spradlin* rule and distinguished "other types of attempt prosecutions that involve either stringent penalties, or ambiguity, but not both." *Id.* at 1011 (emphasis in original) (footnotes omitted). The ambiguity in attempted murder cases stems from the fact that "it is often unclear whether the defendant intended to murder or batter, whether he knew of a high probability of death or a touching, or whether he simply recklessly disregarded either." *Id.* at 1010. *Richeson* involved a conviction for attempted battery, and the Court concluded that the attempt and battery statutes, when taken together, did not require that the State prove that the defendant intended to batter. *Id.* Instead, the two statutes would be satisfied "if the instruction require[d] the State to prove that the defendant took a substantial step to accomplish a *knowing or intentional* battery." *Id.* Our Supreme Court expressly limited the *Spradlin* rule to the crime of attempted murder when it stated, "[w]e conclude that the special precautions we took in *Spradlin* are not warranted for lesser offenses." *Richeson,* 704 N.E.2d at 1011.

■■■■■ Here, however, attempted voluntary manslaughter is not a lesser offense of attempted murder. The reasoning given in *Richeson* applies with equal force to the crime of attempted voluntary manslaughter, if not more so, because the "special precautions" that distinguish attempted murder from other attempt crimes are also present in attempted voluntary manslaughter prosecutions. The offense of attempted voluntary manslaughter includes the same "intent ambiguity" that is involved in proving attempted murder because "it is often unclear whether the defendant intended to murder or batter, whether he knew of a high probability of death or a touching, or whether he simply recklessly disregarded either." *Id.* at

1010. Indeed, attempted voluntary manslaughter's additional element of sudden heat makes it even more likely that this ambiguity exists. "Sudden heat" is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection. *Washington v. State,* 808 N.E.2d 617, 625–26 (Ind.2004). When a reasonable person is acting with sufficient passion to render them incapable of cool reflection, an ambiguity is likely to exist as to whether the person intended to murder or batter or just intimidate. Additionally, the higher sentencing range for attempted murder is also present for the offense of attempted voluntary manslaughter. Attempted voluntary manslaughter with a deadly weapon is a Class A felony and carries the same penalty as attempted murder. *See* IC 35–41–5–1; IC 35–42–1–3. Because prosecutions for attempted voluntary manslaughter have both the higher sentencing range and the ambiguities involved in the proof of attempted murder prosecutions, we conclude that attempted voluntary manslaughter is not a lesser offense of attempted murder, and therefore the *Spradlin* rule applied. Therefore, the trial court erred in failing to instruct the jury that the State was required to prove that Harris acted with the specific intent to kill. We reverse his conviction for attempted voluntary manslaughter and remand for a retrial.[4]

## II. Sufficient Evidence

■ "A defendant who succeeds in having his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to

conviction may be retried so long as there was sufficient evidence to support the conviction." *Sapen v. State,* 869 N.E.2d 1273, 1279 (Ind.Ct.App.2007), *trans. denied* (citing *Lehman v. State,* 777 N.E.2d 69, 73 (Ind.Ct.App.2002)). Therefore, we must determine if sufficient evidence supported Harris's conviction for attempted voluntary manslaughter. Our standard of review for sufficiency claims is well settled. We do not reweigh the evidence or judge the credibility of the witnesses. *Williams v. State,* 873 N.E.2d 144, 147 (Ind.Ct.App. 2007). We will consider only the evidence most favorable to the judgment together with the reasonable inferences to be drawn therefrom. *Id.; Robinson v. State,* 835 N.E.2d 518, 523 (Ind.Ct.App.2005). We will affirm the conviction if sufficient probative evidence exists from which the fact finder could find the defendant guilty beyond a reasonable doubt. *Williams,* 873 N.E.2d at 147; *Robinson,* 835 N.E.2d at 523.

■ Harris argues that the evidence presented at trial was insufficient to support his conviction for attempted voluntary manslaughter. He specifically contends that the evidence was not sufficient to prove he had the specific intent to kill Gann. Harris asserts that the facts and the inferences drawn from them support the conclusion that his intent was something other than the intent to kill. He also claims that the State's evidence supporting an intent to kill, D.S.'s statements to the 911 operator, was not credible because D.S. admitted he lied about how many shots had been fired in order to get the police to respond quickly. *Tr.* at 77.

As concluded in the previous section, in order to convict Harris of attempted voluntary manslaughter, the State was required

---

**4.** We note that Harris was also convicted of carrying a handgun without a license, but does not appeal that conviction here. There-

fore, our decision here does not affect that conviction.

to prove that Harris acted with the intent to kill Gann. We believe that sufficient evidence was presented to support Harris's conviction. The evidence presented showed that Harris shot at the front door almost immediately after Gann had forced him out of the residence and shot at the center of the door, at a location where Gann was likely to be after closing the door. After firing the shot, Harris yelled something like, "I shot one through the door and I've got four in the chamber, now you want to 'F' with me." *Tr.* at 102. Both D.S. and T.G. also testified that Harris threatened to kill Gann. *Id.* at 68, 131.[5] Additionally, it could reasonably be inferred that Harris was aware of the high probability that firing a gun at the door that Gann had just closed would result in his death. *See* IC 35–41–2–2; *Oliver v. State*, 755 N.E.2d 582, 588 (Ind.2001) ("A knowing killing may be inferred from the use of a deadly weapon in a manner likely to cause death."). Sufficient evidence was presented to support Harris's conviction for attempted voluntary manslaughter.

### III. Admission of Video

 Although it is likely to be raised on retrial, we do not address Harris's argument that the trial court erred in admitting a videotape containing statements made by Harris. Generally, the admission or exclusion of evidence is a determination within the sound discretion of the trial court. *Smith v. State*, 839 N.E.2d 780, 784 (Ind.Ct.App.2005). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *McVey v. State*, 863 N.E.2d 434, 440 (Ind.Ct.App. 2007), *trans. denied.* Because any comment by us on the admissibility of the evidence in the trial now before us may be

interpreted to limit or restrict the discretion of the trial court on retrial, we refrain from making any such comments.

Affirmed in part, reversed in part, and remanded.

RILEY, J., and MAY, J., concur.

**5.** Harris's argument that D.S. lied to the 911 dispatcher about Harris's threats in order to get the police to respond quicker is merely an invitation to judge the credibility of the witness, which we cannot do. *Williams v. State*, 873 N.E.2d 144, 147 (Ind.Ct.App.2007).