## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 22 2015, 8:44 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Bruce E. Andis
Daniel A. Dixon
Lawrence County Public Defender
Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeffery L. Gipson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | December 22, 2015 <br><br> Court of Appeals Case No. <br> 47A01-1501-CR-23 <br><br> Appeal from the Lawrence Superior Court <br><br> The Honorable Michael Robbins, Judge <br><br> Trial Court Cause Nos. <br> 47D01-1212-FA-1456 <br> 47D01-1209-FA-1058 |

**Robb, Judge.**

# Case Summary and Issues

[1]     Following a jury trial, Jeffery Gipson was convicted of three counts of child molesting and one count of attempted child molesting, all Class A felonies, and two counts of contributing to the delinquency of a minor, both Class A misdemeanors. The jury also found Gipson to be an habitual offender. The trial court ordered Gipson serve 110 years in the Indiana Department of Correction. Gipson raises three issues for our review: 1) whether the trial court committed reversible error by admitting into evidence a cell phone memo in its entirety under Indiana Evidence Rule 803(3); 2) whether the trial court committed reversible error by admitting Gipson's statements made after a polygraph examination; and 3) whether Gipson's sentence is inappropriate in light of the nature of the offenses and his character. Concluding the trial court did not commit reversible error in the admission of evidence, we affirm Gipson's convictions. Also concluding Gipson's sentence is not inappropriate in light of the nature of the offenses and his character, but the trial court erred in its handling of Gipson's habitual offender enhancement, we affirm his sentence but remand with instructions.

# Facts and Procedural History

[2] In the spring of 2012, Gipson and C.G. lived together in a home in Mitchell, Indiana;[1] the pair had dated on and off for approximately six years. Mikey Allen, Jason Farmer, and Gipson's and C.G.'s son, A.G., also lived in the home. When the couple were having relationship problems, Gipson would stay with his friend, Dustin Jamison, who lived across the street from C.G. C.G.'s daughter, thirteen-year-old A.M.G., also lived with C.G. Although not A.M.G.'s biological father, Gipson "was basically [A.M.G.'s] father for some time." Transcript at 634.

[3] J.W., also thirteen years old, and A.M.G. befriended one another in middle school. J.W. often visited A.M.G. at C.G.'s home, and spent the night on occasion. J.W. was attracted to, and flirted with, Gipson. J.W. and Gipson began communicating via text messages. Thereafter, the messages became sexual in nature, and the two began sharing explicit photographs. Specifically, Gipson sent J.W. a picture of his penis, and J.W. sent pictures of her naked body, including her vagina.

[4] The first sexual contact between Gipson and J.W. occurred in March 2012. J.W. was sleeping on the couch in C.G.'s living room when Gipson arrived home intoxicated. J.W. awoke to Gipson inserting his finger into her vagina;

---

[1] We identify C.G., an adult, only by her initials to protect the privacy of the child victims.

J.W. pretended to remain asleep. Acknowledging J.W.'s lack of response, Gipson stopped and stated, "we'll wait until tomorrow." *Id.* at 735.

[5] The following morning, J.W. and Gipson were left alone in the home while Allen, A.G., and A.M.G. visited the Indianapolis Zoo; C.G. was at work. Over the course of a couple hours, J.W. and Gipson had sex three or four times in C.G.'s living room. Gipson also performed oral sex on J.W. A few days later, J.W. created a memo in her cell phone, which stated, "I feel like such a whore! I slept with my best friend's dad Sat. March 31. I loved it so much & I really like him, but [A.M.G.'s] my bestie and I need to tell her." State's Exhibit 32.[2] Ultimately, J.W. told A.M.G she had sex with Gipson in C.G.'s living room. A few weeks later, J.W. claimed she and Gipson twice had sex in a detached garage behind C.G.'s home and, on two more separate occasions, the two again had sex in C.G.'s living room and detached garage.

[6] On April 26, 2012, J.W. and A.M.G. went across the street to Jamison's house where Gipson and his friend, Farmer, shared a bedroom. Gipson was staying at Jamison's home because Gipson and C.G. had gotten into a dispute. When the two girls arrived, Gipson and Farmer were the only two people in the home; Jamison was not present. The four of them began to drink alcohol and settled into a bedroom to watch television. A.M.G. began to feel ill and laid down on the bed. Gipson joined her, and Farmer and J.W. left the room.

---

[2] J.W. testified the cell phone memo was essentially "an electronic version of a diary." Tr. at 799.

[7]     Once alone with A.M.G, Gipson began acting "kind of sexual and odd."  Tr. at 655.  Gipson then took off A.M.G.'s pants and underwear, and attempted to insert his penis into A.M.G.'s vagina, but A.M.G. claimed "it wasn't going in and it hurt really bad so he just did alternatives instead."  *Id.* at 656.  Those alternatives included Gipson performing oral sex on A.M.G. and inserting his fingers into her vagina.  A.M.G. stated she wanted to stop and go home, but Gipson did not stop until J.W. entered the room.  Gipson told A.M.G. to act like she was asleep, but her eyes remained open with the hopes of attracting J.W.'s attention; J.W. was too drunk to notice.[3]  J.W. exited the room, and Gipson continued the sexual acts on A.M.G.  Again, J.W. entered the room and Gipson stopped.  At this point, A.M.G. put her clothes back on, and she and J.W. returned across the street to C.G.'s home.

[8]     When they arrived at C.G.'s home, A.M.G. told J.W. about Gipson's acts.  This upset J.W. because she "liked [Gipson] and . . . was mad that he wanted to be with A.M.G."  *Id.* at 754.  A.M.G. later took a bath because she "just felt nasty."  *Id.* at 659.  While A.M.G. took a bath, Gipson returned to C.G.'s home.  Later that evening, with A.M.G. asleep in her bedroom and with C.G. in the living room, J.W. joined Gipson in a bedroom where they had sex.  The two stopped when they heard C.G. begin walking towards the bedroom.  Gipson then hopped into bed and pretended to be asleep as J.W. remained

---

[3] At trial, A.M.G testified, "I had a pleading look on my face just like please help, but she didn't pay attention."  Tr. at 657.

seated on the floor. When C.G. entered the bedroom, she witnessed J.W. on the floor and called J.W. a stalker, stating later at trial that "it was kind of weird for her to be watching him sleep." *Id.* at 839.

[9] The following day, a visibly upset A.M.G. told her mother about Gipson's acts. J.W. also told C.G. about her sexual encounters with Gipson. After C.G. confronted Gipson, J.W. went over to Jamison's home to talk with Gipson. Gipson began yelling at J.W., called her a snitch, and stated she had ruined his life. A few days later, C.G. reported Gipson to the authorities.

[10] After both girls disclosed sexual abuse during interviews with the Indiana Department of Child Services, Detective Brian Smith of the Indiana State Police initiated an investigation. As a part of the investigation, Detective Smith asked Gipson if he would go to the Bloomington State Police Post for an interview. Gipson was not in custody and obliged Detective Smith's request. During the interview, Gipson acknowledged he had prior communications with J.W. on the phone and via text messaging. In addition, Gipson stated he had previously been alone with J.W. in C.G.'s detached garage. Gipson, however, denied any sexual relations with J.W. When questioned about A.M.G.'s allegations, Gipson acknowledged there was a time when he and A.M.G. were alone in a bedroom together at Jamison's house. However, Gipson denied performing any sexual acts on A.M.G.

[11] Thereafter, Detective Smith requested Gipson submit to a non-stipulated polygraph examination with Sergeant Paul Hansard of the Indiana State Police.

Not being in police custody, Gipson drove himself and voluntarily submitted to the examination on June 28, 2012. When Gipson arrived, Sergeant Hansard explained the polygraph process and read over a polygraph waiver with Gipson. The waiver provided,

> Before we ask you any questions, you must understand your rights.
> * * *
> You have the right to remain silent.
> * * *
> Anything you say can be used against you in court.
> * * *
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
> * * *
> If you cannot afford a lawyer, one will be appointed to you before any questioning, if you wish.
> * * *
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
> * * *
> I have read the above statement of my rights and it has been read to me. I understand what my rights are. I do wish to take the polygraph test. No force, threats, or promises of any kind or nature have been used by anyone in any way to influence me to waive my rights. I am signing this statement after having been advised of my rights and before taking the polygraph test.

State's Ex. A.

[12] Gipson reviewed, stated he understood, initialed, and signed the waiver prior to submitting to the polygraph examination. During the examination, Sergeant

Hansard asked Gipson if his penis touched A.M.G.'s vagina. Gipson answered in the negative. Following the examination, Sergeant Hansard interpreted the results and determined Gipson failed the polygraph examination. Sergeant Hansard told Gipson about his interpretation of the results and asked Gipson for an explanation. Gipson stated he had gotten into bed with A.M.G. the night they had been drinking alcohol at Jamison's home. According to Gipson, A.M.G. took off her pants and underwear, unzipped his pants, pulled his penis out, and then tried to insert it into her vagina. Once he realized what was occurring, Gipson claimed he stopped A.M.G. and told her to go home.

[13] Once Sergeant Hansard finished his questioning, Detective Smith entered the room to speak with Gipson. Detective Smith reminded Gipson of his rights, and Gipson acknowledged his rights. Gipson then relayed the same story to Detective Smith. When asked about his involvement with J.W., Gipson did not answer. Detective Smith did not arrest Gipson at that time, and Gipson drove himself home.

[14] The State filed two separate causes against Gipson and, at Gipson's request, the causes were later consolidated for trial. For the alleged conduct with A.M.G., the State charged Gipson with Count I, Class A felony child molesting; Count II, Class A felony attempted child molesting; Counts III and IV, Class A felony child molesting; and Count V, Class A misdemeanor contributing to the delinquency of a minor. For the alleged conduct with J.W., the State charged Gipson with Counts VI-X, Class A felony child molesting; and Count XI, Class

A misdemeanor contributing to the delinquency of a minor. The State also charged Gipson with Count XII, being an habitual offender.

[15] On February 3, 2014, Gipson filed a motion to suppress his post-polygraph statements made to Detective Smith and Sergeant Hansard, arguing the statements were not made voluntarily. Due to the potential of unfair prejudice to Gipson, the trial court ordered the video not be played in the presence of the jury. However, the trial court stated both Detective Smith and Sergeant Hansard could testify as to Gipson's statements. Gipson sought interlocutory appellate review of the trial court's order, which we denied.

[16] At trial on November 17, Gipson objected to the admission of a picture of J.W.'s cell phone memo, arguing the memo amounted to inadmissible hearsay. The trial court overruled the objection and admitted the memo into evidence. At trial, J.W. testified on the State's re-direct:

> [State:] Do you recall when it is you would have created the text of the memo in comparison to [March 31]?
> [J.W.:] Most likely a few days after.
> [State:] Why is it that you created this memo?
> [J.W.:] Because I felt I guess the correct term would be dirty.
> * * *
> [State:] [D]id it help you in any way to create this memo?
> [J.W.:] Yes.
> [State:] How did it help you?
> [J.W.:] At first, or at the beginning, to remember it and then after that I'm pretty sure I edited [the memo] because I didn't feel like it was right not to say anything to her.
> [State:] Did you, after you created the memo, did that feeling change at all?

[J.W.:]  A little.
[State:]  How did it change?
[J.W.:]  It got the weight off my shoulders.
* * *
[State:]  And then you did in fact end up telling A.M.G., correct?
[J.W.:]  Yes.

Tr. at 799-800, 805.  Evidence at trial also included the testimony of Detective Smith, who testified—over Gipson's objections—to Gipson's post-polygraph statements; Sergeant Hansard did not testify at trial.  In addition, the jury requested to see the memo during deliberations.  Having forgotten to send all the exhibits to the jurors at the beginning of deliberations, the trial court ordered all of the exhibits be delivered to the jurors, including the picture of the cell phone memo.

[17]     In regards to offenses committed against A.M.G., the jury found Gipson guilty of Count II attempted child molesting, Count III child molesting, and Count V contributing to the delinquency of a minor.[4]  As to J.W., the jury found Gipson guilty of Count VI child molesting, Count VII child molesting, and Count XI contributing to the delinquency of a minor.[5]  The jury also found Gipson to be

---

[4] These three counts stem from the events that occurred on April 26, 2012.  Count II alleged, "Gipson . . . did attempt to perform or submit to sexual intercourse with [A.M.G] . . . ."  Appellant's Appendix at 41.  Count III alleged, "Gipson . . . did perform deviate sexual conduct with [A.M.G.] . . . ."  *Id.*  Count V alleged, "Gipson . . . did knowingly or intentionally aid, induce or cause [A.M.G.] . . . to commit an act of delinquency."  *Id.* at 42.

[5] Count VI alleged, "On or about March, 2012 . . . Gipson . . . did perform or submit to sexual intercourse with J.W. . . . ."  *Id.* at 65.  Count VII alleged, "On or about March, 2012 . . . Gipson . . . did perform deviate sexual conduct, to-wit: placed finger in vagina, with J.W. . . . ."  *Id.*  Count XI alleged, "On or about April,

an habitual offender. The trial court entered a judgment of conviction on the above counts.

[18] For the offenses committed against A.M.G., the trial court sentenced Gipson to forty years on Count II, forty years on Count III, and one year on Count V, all to be served concurrently for a total of forty years. For the crimes committed against J.W., the trial court sentenced Gipson to forty years on Count VI, forty years on Count VII, and one year on Count XI, all to be served concurrently for a total of forty years. The trial court ordered the two forty-year concurrent sentences be served consecutively for a total of eighty years. Finally, the trial court sentenced Gipson to thirty years for the habitual offender finding, to run "consecutive to the terms imposed" in the other two causes. Tr. at 1153. In total, the trial court ordered Gipson serve 110 years executed in the Department of Correction. This appeal ensued.

# Discussion and Decision

## I. Admission of Evidence

### A. Standard of Review

[19] We review a trial court's admission of evidence for an abuse of discretion. *McVey v. State*, 863 N.E.2d 434, 440 (Ind. Ct. App. 2007), *trans. denied*. "An

---

2012 . . . Gipson . . . did knowingly or intentionally aid, induce, or cause J.W. . . . to commit an act of delinquency." *Id.* at 66.

abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court." *Id.* We neither weigh the evidence nor resolve questions of credibility, "but consider the evidence which supports the decision of the trier of fact in the case of contested evidence and any uncontested evidence presented by the appellant." *Davies v. State*, 730 N.E.2d 726, 732 (Ind. Ct. App. 2000), *trans. denied*, *cert. denied*, 532 U.S. 945 (2001).

[20] We reverse a trial court's erroneous decision to admit evidence only when the decision affects a party's substantial rights. *McVey*, 863 N.E.2d at 440. However, "[a]ny error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted." *Id.* In other words, "[t]he improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Wickizer v. State*, 626 N.E.2d 795, 800 (Ind. 1993).

## B. Cell Phone Memo

[21] Gipson claims the trial court abused its discretion in admitting into evidence the cell phone memo written by J.W. a few days after she first had sex with Gipson. The memo stated, "I feel like such a whore! I slept with my best friend's dad

Sat. March 31.  I loved it so much & I really like him, but [A.M.G.'s] my bestie and I need to tell her."  State's Ex. 32.

[22]  Initially, we note the memo constitutes hearsay.  "Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted."  *Coleman v. State*, 946 N.E.2d 1160, 1168 (Ind. 2011) (citing Ind. Evidence Rule 801(c)).  The memo is an out-of-court statement offered to prove the truth of the matter asserted, namely J.W. felt "dirty" about having sex with Gipson on March 31 and deemed it necessary to share that information with A.M.G.  Tr. at 800.

[23]  Hearsay is not admissible unless it falls within an exception.  Evid. R. 802.  The trial court concluded the memo constituted hearsay, but found it fell within the purview of Indiana Evidence Rule 803(3), which creates, regardless of whether the declarant is available as a witness, "a hearsay exception for statements of the declarant's then-existing state of mind at the time the statement was made.  State of mind, as that term is defined, may include emotion, sensation, physical condition, intent, plan, motive, design, mental feeling, pain, and bodily health."  *Camm v. State*, 908 N.E.2d 215, 226 (Ind. 2009).  This does not include "a statement of memory or belief to prove the fact remembered or believed . . . ."  Evid. R. 803(3).

[24]  In criminal cases involving out-of-court statements of a victim's state of mind, evidence of the victim's state of mind is relevant and admissible only "(1) to show the intent of the victim to act in a particular way, (2) when the defendant puts the victim's state of mind in issue, and (3) sometimes to explain physical

injuries suffered by the victim." *Hatcher v. State*, 735 N.E.2d 1155, 1161 (Ind. 2000). Of the three instances, only one is relevant here: to show the intent of the victim to act in a particular way.

[25] The bulk of the cell phone memo consists of statements concerning J.W.'s then-existing state of mind and emotions, and her intent to act in a particular way. It speaks of how she felt guilty about having sex with Gipson, who acted as a fatherly figure towards J.W.'s best friend, A.M.G. It also speaks of how J.W. deemed it necessary to confess to A.M.G, which she later did. These statements show J.W.'s intent to act in a particular way. Moreover, J.W. testified that when she created the memo, she felt "dirty" for having sex with Gipson, and after creating the memo, she felt a weight lifted off her shoulders. Tr. at 800. To the extent the memo describes J.W.'s then-existing state of mind and emotions, and intent to act in a particular way, it was admissible pursuant to Indiana Evidence Rule 803(3). *See Heinzman v. State*, 970 N.E.2d 214, 224 (Ind. Ct. App. 2012) (holding a child molestation victim's statements in a letter to the defendant were admissible because they spoke to the child's then-existing state of mind and emotions), *vacated in part, and summarily aff'd in part*, 979 N.E.2d 143 (Ind. 2012).

[26] Although parts of the memo do speak to J.W.'s then-existing state of mind, Gipson contends the remaining statements exceed the scope of the Rule 803(3) exception because those statements were offered to prove a fact remembered, namely that Gipson and J.W. had sex on March 31. Gipson claims the trial court should have, at the very least, redacted the memo to only include the

statements speaking to J.W.'s then-existing state of mind. Therefore, Gipson argues admission of the entire memo constituted reversible error because the State relied solely on the victims' credibility, the memo was not cumulative of other evidence, the jury specifically asked to review the memo during deliberations, and the jury convicted Gipson only for the conduct referenced in the memo. We disagree admission of the memo constituted reversible error.

[27] In *Heinzman*, we concluded the admission of a letter written by the child victim to the defendant, which contained both admissible statements pertaining to the victim's state of mind and inadmissible statements referencing the defendant's acts of molestation, constituted harmless error. *Id.* at 224. We reasoned, "Z.B. testified clearly and directly regarding Heinzman's acts of molestation. The few indirect references to the molestation contained in the letter are relatively innocuous by comparison and are, at most, cumulative of Z.B.'s direct testimony." *Id.*

[28] Here, we agree with Gipson that the memo contains a direct reference to Gipson's acts of molesting J.W. Similar to *Heinzman*, however, J.W. clearly and directly testified as to Gipson's acts of molestation on March 31—the day Gipson and J.W. were left alone in C.G.'s home. Therefore, the reference to Gipson's acts of molestation in the memo is merely cumulative of J.W.'s direct testimony. *See id.*

[29] Finally, we note reversal is appropriate only where "the record as a whole discloses that the erroneously admitted evidence was likely to have had a

prejudicial impact on the fact-finder, thereby contributing to the judgment."
*Hamilton v. State*, No. 65A04-1412-CR-592, slip op. at 10 (Ind. Ct. App. Sept. 9, 2015) (citation omitted). After reviewing the entirety of the record, we conclude admission of the memo was not likely to have had a prejudicial impact on the jury despite the jury both requesting to see the memo during deliberations and convicting Gipson for the act referenced in the memo. This conclusion is supported by the corroborating testimony of the State's witnesses and the fact the memo merely offered cumulative evidence of J.W.'s direct testimony. Therefore, even if admission of the memo constituted error, the error was harmless.

## C. Post-Polygraph Statements

[30] Gipson also contends the trial court erred in admitting his post-polygraph statements because the statements were not voluntary. Specifically, he argues the statements were made after his will was overcome due to the combination of there being no reference to post-polygraph questioning on the polygraph waiver, Sergeant Hansard's exaggeration of the reliability of the polygraph results, and coercive interrogation tactics. The State argues Gipson's statements were not made involuntarily because Gipson was not in custody, law enforcement read Gipson his *Miranda* rights, and Gipson "readily accepted the opportunity to give a statement" to law enforcement. Brief of Appellee at 16.

[31] Although we have expressed reservations about the reliability of polygraph results, "the fact that a polygraph test is not sufficiently reliable to warrant

admission of its results does not undermine the reliability of voluntary statements made by a defendant during a polygraph test." *McVey*, 863 N.E.2d at 441. The question of whether a defendant made a voluntary statement is determined from the totality of the circumstances. *Jackson v. State*, 735 N.E.2d 1146, 1153 (Ind. 2000). The State has the burden of proving beyond a reasonable doubt the statement "was voluntary and not induced by violence, threats, promises, or other improper influences so as to overcome the free will of the accused at the time" the statements were made. *Davies*, 730 N.E.2d at 732.

[32] At the hearing on Gipson's motion to suppress his post-polygraph statements, Sergeant Hansard testified to his customary polygraph procedure:

> I generally meet with the investigator fifteen minutes or so beforehand to get an idea what the case is about. And then I bring the subject back into the polygraph suite or the polygraph testing area. I introduce myself. Give them a little overview of what's going to take place, how long things are going to take place. Then we have a polygraph waiver form that is read to them and we make sure that they can read, write and understand the English language, still read it to them out loud. I specifically have them initial after each line to make sure they've understood the waiver. If they still want to take the test and they sign the waiver, at that point I go through and gather some basic background information. This is kind of like the pretest phase if you will. And that includes family history, education history, medical kinds of issues, just some general questions like that. When that's finished I go through and explain polygraph to them. Tell them what it's about, what the different components are and how polygraph works. When that is finished we talk about their case and why they're there today. I have them

explain it to me what they're being accused of. I try to gather some details from them. At that point then we do question formulation where I explain to them what kind of questions are going to be on their test. We kind of come up with a framework for that at that point. After that is finished I give them a break, let them go back out to the lobby. Restroom, drinking fountain's [sic] out there. They're welcome to go outside and smoke if that's what they choose to do. Usually it takes me about ten or fifteen minutes. That's when I type their questions into the computer. I bring them back in. We (indiscernible) at that point is what's called the end test phase which is where I'm actually running the polygraph examination. After that's complete I'll step out, score their charts, discuss the results with the investigator, then go back in and discuss their results with the person that took the test.

Tr. at 52-54.

[33] Prior to the actual polygraph examination beginning in this case, Sergeant Hansard explained the polygraph process to Gipson, and additionally explained the examination was ninety-five to one hundred percent accurate. Sergeant Hansard then handed the polygraph waiver to Gipson. Gipson read the waiver to himself, and then Sergeant Hansard read the waiver to Gipson line-by-line. Gipson initialed each line and signed the waiver. At the conclusion of the polygraph examination, Sergeant Hansard analyzed the results of the polygraph and determined Gipson was not being truthful. Sergeant Hansard re-entered the polygraph suite to discuss the results with Gipson, which Sergeant Hansard testified is customary procedure. In addition, we have previously held "[c]onfronting a suspect with polygraph results is not coercive or

unreasonable." *McVey*, 863 N.E.2d at 443 (citing *Wyrick v. Fields*, 459 U.S. 42, 48 (1982)).

[34] Sergeant Hansard told Gipson about his interpretation of the results and asked Gipson for an explanation. Gipson explained that when he and A.M.G. were laying in a bed together at Jamison's house, A.M.G. took off her pants and underwear, unzipped Gipson's pants, pulled Gipson's penis out, and then tried to insert it into her vagina. It was at this point, Gipson claimed, he told A.M.G. to stop and go home. Gipson repeated the story to Detective Smith. At trial, Detective Smith testified to Gipson's statements.

[35] Gipson's primary argument in support of his contention that his will was overcome is that he stated "I'm done" on at least three different occasions during the post-polygraph phase of the examination. Gipson contends investigators refused his attempts to end the interview thereby rendering his subsequent statements involuntary. We disagree. In one such instance, Gipson stated, in regards to the allegations against him, "I'm trying, but I have to look over my shoulder every f***ing day now, and I'm damn near the point where I have to quit my job. I am getting ready to lose my son again, and I have already lost my youngest [child]. *I'm done*. I have already lost it." Defendant's Ex. 1 (emphasis added). Every time Gipson stated he was "done," Gipson continued to converse with Sergeant Hansard. Based on the context of the entire interview, we are not convinced Gipson was seeking to end the interview. Rather, the record indicates Gipson was likely aware of the impact the girls'

allegations carried and the effects the allegations would have on his life, namely his ability to maintain custody of his son.

[36] Gipson also argues his will was overcome because Sergeant Hansard, prior to Gipson taking the examination, exaggerated the reliability of the polygraph by stating it was ninety-five to one hundred percent accurate. As expressed above, we do have reservations about the reliability of polygraph results. *See McVey*, 863 N.E.2d at 441. Sergeant Hansard, however, testified at the suppression hearing that he explained this to Gipson because he wanted Gipson to have faith that he was receiving a fair test.

[37] Further, the record indicates Sergeant Hansard was respectful and polite throughout all three phases of the polygraph examination. He explained the entire polygraph process to Gipson, including the pre-polygraph, actual polygraph, and post-polygraph phases. He told Gipson he would receive a break prior to the actual polygraph phase of the examination, which Gipson received. Moreover, prior to beginning the examination, Gipson indicated he understood his rights and then initialed and signed the polygraph waiver. Having read and understood his rights—specifically the right to remain silent, the right to have counsel present, and the right to stop answering at any time— Gipson voluntarily provided Sergeant Hansard with an explanation for the results of the examination.

[38] When Detective Smith entered the room to discuss the polygraph results with Gipson, Detective Smith asked Gipson whether he was advised of his rights

and whether he understood his rights. Gipson responded affirmatively to both questions. Before Gipson relayed the story to Detective Smith, Detective Smith stated Gipson was not under arrest, and Detective Smith had no intention of placing Gipson under arrest. Thereafter, Gipson stated, "I've got an explanation for you and I am willing to give it you." Defendant's Ex. 1. Once Gipson explained it was A.M.G. who grabbed his penis and pulled it near her vagina, Gipson told Detective Smith he needed to leave the interview. Detective Smith responded by stating Gipson was not in custody and he was free to leave at any time, but sought an explanation in regards to J.W.'s allegations. Gipson stated there was nothing to explain, and Gipson left on his own volition. This indicates Gipson understood he was not required to answer any questions and that he was free to end the interview at any time.

Based on the totality of the circumstances, we are not persuaded Gipson's statements were induced by violence, threats, promises, or other improper influences so as to overcome Gipson's free will. Therefore, the trial court did not abuse its discretion in allowing Detective Smith to testify to Gipson's statements.

# III. Inappropriateness of Sentence

## A. Standard of Review

Gipson also contends his sentence is inappropriate in light of the nature of the offenses and his character. A reviewing court possesses the authority to revise a defendant's sentence "if, after due consideration of the trial court's decision, the

Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). The burden is on the defendant to persuade the reviewing court the sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). It is not for the reviewing court "to achieve a perceived 'correct' result in each case," but "[t]he principal role of appellate review should be to attempt to leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224.

## B. Gipson's Sentence

Gipson was convicted of three counts against each victim. For the crimes committed against A.M.G., the trial court sentenced Gipson to forty years. For the crimes committed against J.W., the trial court sentenced Gipson to forty years. In recognition of the harm done to each victim, the trial court ordered the two forty-year sentences be served consecutively thereby increasing Gipson's sentence to eighty years. Finally, the trial court sentenced Gipson to thirty years, to be served consecutively to the others, because of his habitual offender status. In total, the trial court ordered Gipson serve 110 years in the Department of Correction.

[42] As to the nature of the offenses, the advisory sentence is the starting point the legislature selected as an appropriate sentence for the crime committed. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). Pursuant to Indiana Code section 35-50-2-4(a), a person who commits a Class A felony "shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years." Here, Gipson was in a position of trust and authority in relation to both victims, especially A.M.G., for whom Gipson was a fatherly figure. In addition, this is not a case where there is only one claim of child molestation. Rather, this is a case where there are multiple allegations of child molestation against two victims. Finally, the record indicates Gipson provided alcohol to A.M.G. and when she started to feel the effects of the alcohol, Gipson took advantage of her vulnerability and molested her. We cannot turn a blind eye to such conduct.

[43] As to his character, Gipson's criminal history dates back to when he was twelve years old. Gipson was adjudicated a delinquent for committing various offenses over a span of four years, including burglary, automobile theft, criminal recklessness with a deadly weapon, and battery resulting in bodily injury. As an adult, Gipson has been convicted of multiple crimes, including burglary as a Class C felony, automobile theft as a Class D felony, and criminal recklessness as a Class D felony. We note these three crimes are the same three crimes for which Gipson was adjudicated a delinquent, which shows Gipson failed to learn from his past encounters with the law. Although Gipson

attempts to make light of his criminal history by noting his age at the time of his earlier convictions, the amount of time elapsed since his prior felony convictions, and that he has no criminal history of sexual abuse prior to these convictions, it is evident Gipson learned nothing from his previous encounters with the law, and we are not persuaded his sentence is inappropriate.

[44] Finally, although not raised by Gipson, the State has noted the trial court erred in sentencing Gipson to thirty years for the habitual offender finding, to run "consecutive to the terms imposed" in the other two causes. Tr. at 1153. Indiana Code section 35-50-2-8(h) (2005) states,

> The court shall sentence a person found to be a habitual offender to an additional fixed term that is not less than the advisory sentence for the underlying offense nor more than three (3) times the advisory sentence for the underlying offense. However, the additional sentence may not exceed thirty (30) years.

When a jury finds a defendant is a habitual offender, it is a fact which "requires the trial court to enhance the sentence for the instant crime by the statutory term." *Lord v. State*, 531 N.E.2d 207, 208 (Ind. 1988). Here, the trial court did not enhance one of Gipson's felony sentences due to his status as an habitual offender but ordered a separate consecutive sentence. Therefore, we remand to the trial court to correct its sentencing order and attach the habitual offender enhancement to one of Gipson's felony convictions. *See Greer v. State*, 680 N.E.2d 526, 527 (Ind. 1997) ("In the event of simultaneous multiple felony convictions and a finding of habitual offender status, trial courts must impose

the resulting penalty enhancement upon only one of the convictions and must specify the conviction to be so enhanced.").

# Conclusion

[45] We conclude the trial court did not commit reversible error in the admission of evidence and Gipson's sentence is not inappropriate. However, the trial court erred in sentencing Gipson to a consecutive term of thirty years due to his status as an habitual offender. We therefore affirm Gipson's convictions and sentence, but remand to the trial court for the limited purpose of correcting the sentencing order with respect to the sentencing enhancement for Gipson's habitual offender finding.

[46] Affirmed and remanded with instructions.

Pyle, J., concurs.

Vaidik, C.J., concurs in result.