## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 21 2020, 9:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvette M. LaPlante
LaPlante LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Darius Shawtee McNary,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 21, 2020

Court of Appeals Case No. 20A-CR-381

Appeal from the Vanderburgh Circuit Court

The Honorable
Kelli E. Fink, Magistrate

Trial Court Cause No. 82C01-1903-F2-1460

**Kirsch, Judge.**

[1] Darius Shawtee McNary ("McNary") was convicted in a jury trial of dealing in methamphetamine in the amount of ten grams or more,[1] a Level 2 felony; possession of methamphetamine in the amount of twenty-eight grams or more,[2] a Level 3 felony; dealing in marijuana weighing at least thirty grams but less than ten pounds,[3] a Level 6 felony; and was adjudicated as an habitual offender.[4] McNary raises one issue on appeal, which we restate as whether the trial court abused its discretion in denying McNary's motion to correct error, which alleged that McNary was entitled to a new trial because newly discovered evidence proved that one of the State's witnesses had lied at trial.

[2] We affirm.

## Facts and Procedural History

[3] On January 25, 2019, Indiana State Police Troopers ("the officers") helped Michael Dodge, a parole officer, serve a felony warrant on a person who resided at an Evansville apartment complex. *Tr. Vol. II* at 9, 19-20, 50. Some residents of the apartment complex asked the officers to perform a welfare check on the apartment of Tiffany Taylor ("Taylor"), where McNary also lived. *Id*. at 10, 19-20. The officers knocked on Taylor's door, and when she opened

---

[1] *See* Ind. Code § 35-48-4-1.1(a)(2), (e).

[2] *See* Ind. Code § 35-48-4-6.1(a), (d).

[3] *See* Ind. Code § 35-48-4-10(a)(2), (c)(2)(A).

[4] *See* Ind. Code § 35-50-2-8.

the door, the officers could smell marijuana; Taylor consented to the officers' request to search her apartment. *Id.* at 20, 129-30. During the search, the officers lifted the ceiling tiles in the kitchen and found several bags of marijuana and a large amount of cash. *Id.* at 21-22, 66; *State's Exs.* 1, 2, 3, 17-18. The officers also lifted the ceiling tiles in the bathroom where they found a loaded handgun, a glass smoking pipe, a bag of methamphetamine, a digital scale, and a notebook that Taylor had given McNary. *Tr. Vol. II* at 21, 34, 37, 39, 48; *State's Exs.* 7, 10, 32-33. The notebook was a drug ledger, which recorded drug transactions, including the amount of money exchanged and the names of several buyers, including "Jersey" and "Shorty." *Tr. Vol. II* at 178-80; *State's Exs.* 10, 32. Once the search was over, Taylor's children were placed in foster care that same day. *Tr. Vol. II* at 144, 146, 200. Soon after, the Indiana Department of Child Services filed a petition to find Taylor's children as children in need of services. *Id.* at 144.

[4] On March 1, 2019, the State charged McNary with Level 2 felony dealing in methamphetamine, Level 2 felony conspiracy to commit dealing in methamphetamine, two counts of Level 3 felony possession of methamphetamine, Level 4 felony unlawful possession of a firearm by a serious violent felon, Level 6 felony conspiracy to commit dealing marijuana, Level 6 felony dealing marijuana, and alleged that McNary was an habitual offender.

*Appellant's App. Vol. II* at 23, 26-28.[5]  The State eventually dismissed several counts against McNary, and he proceeded to trial on the habitual offender allegation and three counts:  Count 1, Level 2 felony dealing in methamphetamine; Count 2, Level 3 felony possession of methamphetamine; and Count 3, Level 6 felony dealing marijuana.  The State dismissed the remaining counts.[6]  *Tr. Vol. II* at 4.

[5] Taylor testified at the September 23, 2019 trial.  She stated that she had not made a deal with the State regarding her testimony, although she hoped the State would give her consideration for her testimony against McNary.  *Id*. at 109-10, 158.[7]  Taylor testified that while she was incarcerated, she was unable to get her children back, but that now that she was not incarcerated, she could work toward getting them back.  *Id*. at 158.

_____

[5] About ten weeks later, Taylor was charged with dealing in methamphetamine, conspiracy to deal methamphetamine, possession of methamphetamine, conspiracy to possess methamphetamine, dealing in marijuana, conspiracy to deal marijuana, and possession of marijuana.  *Tr. Vol. II* at 109, 144.

[6] Count 2 and Count 3 were initially designated as Count 4 and Count 7 but were re-designated as Counts 2 and 3 when the State dropped the other charges.  *Tr. Vol. II* at 4.

[7] The record is confusing about whether the State had actually offered Taylor a plea agreement and whether she had accepted such an offer.  In an affidavit filed after trial, Deputy Prosecutor Hunter Renschler stated that on May 13, 2019, he made an offer to Taylor's attorney, in which Taylor would plead guilty as charged in her case and would be sentenced to a term of ten years and that if she would testify against McNary, Deputy Prosecutor Renschler would take her cooperation into account.  *Appellant's App. Vol. III* at 99. Deputy Prosecutor Renschler stated that on June 6, 2019, Taylor's attorney contacted him and said that Taylor would be interested in testifying against McNary.  *Id*.  However, acting as if no formal deal had been agreed to, Deputy Prosecutor Renschler also stated in his affidavit that Taylor was told that the State expected her to tell the truth and "that her cooperation *would be taken into consideration*."  *Id*. at 100 (emphasis added).

[6] Taylor's testimony established some, but not all, of the State's case against McNary. Taylor testified that she began dating McNary in November of 2018 and that he lived at her apartment. *Id*. at 110-12. Taylor and McNary would smoke marijuana together, and McNary introduced Taylor to methamphetamine, which they would also smoke together. *Id*. at 110-11, 114-15. During the time period McNary stayed at Taylor's apartment, he would have two friends over -- Shorty and Jersey -- who would smoke with McNary. *Id*. at 116. Taylor also testified that McNary typically kept the methamphetamine pipe and some methamphetamine in his pocket. *Id*. at 118, 121-22. She also testified that she gave McNary the notebook that McNary later used to record his drug transactions. *Id*. at 127. Taylor identified the scale that McNary used to weigh drugs. *Id*. at 132-33.

[7] Some of Taylor's testimony did not confirm the State's case. For instance, Taylor testified that she never saw a large amount of methamphetamine or marijuana in her apartment. *Id*. at 117-18. She testified that when Jersey and Shorty came over to smoke drugs with McNary, she never saw money exchange hands. *Id*. at 117. Other parts of Taylor's testimony addressed inconsistencies between her statements. On cross-examination, Taylor admitted that when she was questioned by law enforcement at her apartment, she had given a different story because McNary was standing close by and she was afraid of him. *Id*. at 130, 143. Taylor stated she was testifying at McNary's trial because "the truth needs to be heard, and I agreed to cooperate. I have children. I have to take care of them." *Id*. at 160.

[8] On September 23, 2019, McNary was convicted of all charges and admitted to being an habitual offender. *Id.* at 215, 219. On November 7, 2019, McNary was sentenced to an aggregate term of twenty-eight years in the Indiana Department of Correction. *Appellant's App. Vol. II* at 21-22.

[9] Two days after McNary was sentenced, he filed a motion to correct error, with accompanying affidavits, alleging that he had obtained newly discovered evidence that Taylor "testified the way she did due to pressure from the State," and that "the State had coached [Taylor] on what to say and what not to say." *Id.* at 109-12. McNary alleged that that evidence was discovered in two jail phone calls between Taylor and McNary, one occurring on September 27, 2019, and the other call occurring on October 21, 2019. *Id.* at 109-10. McNary claimed that "Taylor clearly gives the impression in the above phone calls that she was pushed into testifying for the State on this manner and that at least some of her testimony was false." *Id.* at 110.

[10] In the September 27 phone conversation, Taylor told McNary that the State was "trying to hit [her] with fucking ten years," and asked McNary "do you want me to look at my kids through glass for ten years." *Appellant's App. Vol. III* at 10-11. Taylor added that "I didn't ever do you wrong. I will say that. I never did you fucking wrong. I tried to do everything that I fucking could for you." *Id.* at 14. In the October 21 phone conversation, Taylor again told McNary that she was "not going to sit in jail for ten years and look at my babies from jail." *Id.* at 19. Taylor told McNary she "gave [the State] as little as I could." *Id.* When McNary asked whether the State had told Taylor what to

say, she replied, "I mean, somewhat, like kinda couching [sic] me about what I could and couldn't say and shit like that," and said that the State subpoenaed her to testify. *Id.* at 22, 25. To provide additional context to Taylor's statements, we provide these excerpts from the two phone conversations:

**Excerpts from Phone Conversation of September 27, 2019**

MS. TAYLOR: You trying to say bogus that I did it?

MR. MCNARY: Yeah.

MS. TAYLOR: Are you talking about that bogus that I did it?

MR. MCNARY: I can't hear you.

MS. TAYLOR: So, are you saying that it was bogus that I did it.

MR. MCNARY: Man, the whole situation (unintelligible).

MS. TAYLOR: Yeah, well, I had to do what I had to do.

. . . .

MS. TAYLOR: What do you mean, Darius? Do you want me to look at my kids through glass for ten years?

MR. MCNARY: I'm saying, why would you do that though? Why would you fucking listen to them and have them make you fucking lie like that? . . . .

. . . .

MR. MCNARY:  Have fucking people talk you into fucking lying . . . ?

MS. TAYLOR:  Well, whatever.

MR. MCNARY:  What?

MS. TAYLOR:  Said whatever.

MR. MCNARY:  Oh, so they didn't tell you to do that?

. . . .

MR. MCNARY:  Like what, n***a?  You fucking let them lie, though.  I mean, you let them fucking talk you into, I know for a fact . . . .  Do you not understand that they basically talked you into basically taking a n***a's life over some stupid dumbass shit?

MS. TAYLOR:  They were trying to hit me with ten years.

. . . .

MR. MCNARY:  Then they dropped all [those charges against you] to get you to fucking lie on me?

MS. TAYLOR:  They didn't drop everything.  So, I still go shit. And I did five fucking months in jail.

*Id*. at 10-12.

**Excerpts from Phone Conversation of October 21, 2019**

MR. MCNARY: And then what? Like what the fuck were they telling you to say?

MS. TAYLOR: You talking about.

Mr. MCNARY: I mean, were they telling you exactly what to say on the way to there?

MS. TAYLOR: I mean, somewhat, like kinda couching [sic] me about what I could and couldn't say and shit like that. . . . .

*Id.* at 22.

[11] On November 18, 2019, Deputy Prosecutor Hunter Renschler ("Deputy Prosecutor Renschler") filed an affidavit asserting, "at no point was . . . Taylor pushed or pressured into testifying for the State and we most certainly never implied or told her to say anything other than the truth." *Id*. at 100. Before calling Taylor to testify, Deputy Prosecutor Renschler advised her that she could not testify about McNary's previous cases or any previous interactions McNary may have had with law enforcement. *Id*.

[12] Two other deputy prosecuting attorneys, James Doyle ("Deputy Prosecutor Doyle") and Jessica Berry ("Deputy Prosecutor Berry"), also submitted affidavits stating that they were present at a September 19, 2019 witness conference with Deputy Prosecutor Renschler and Taylor. *Id*. at 102-05. Both Deputy Prosecutor Doyle and Deputy Prosecutor Berry stated that Taylor was

not threatened or coerced into testifying. *Id*. Deputy Prosecutor Doyle stated that Taylor was not pressured to provide specific answers, and Deputy Prosecutor Berry stated that she instructed Taylor not to speak about McNary's prior bad acts, criminal history, and law enforcement contacts after Taylor brought up those events. *Id*. at 103.

[13] On January 10, 2020, the State and McNary filed a joint stipulation and motion for the trial court to rule on the November 9, 2019 motion to correct error without a hearing. *Id*. at 2-5. The parties attached transcripts of the September and October phone calls, transcripts of Taylor's trial testimony, and numerous motions and affidavits for the trial court's consideration. *Id*. On January 21, 2020, the trial court denied McNary's motion to correct error. *Appellant's App. Vol. II* at 20. McNary now appeals. We will provide additional facts as necessary.

## Discussion and Decision

[14] McNary argues that the trial court abused its discretion in denying his motion to correct error, alleging that he was entitled to a new trial because newly discovered evidence proved that Taylor lied at trial. The decision of whether to grant a new trial on the basis of newly discovered evidence is within the sound discretion of the trial court, and we will reverse the trial court only upon a showing that it abused its discretion. *Reed v. State*, 702 N.E.2d 685, 691 (Ind. 1998). An abuse of discretion occurs only when a trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Jones*

*v. State*, 957 N.E.2d 1033, 1037 (Ind. Ct. App. 2011). To obtain a new trial based on newly discovered evidence, a defendant must make nine showings: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon retrial; and (9) it will probably produce a different result at retrial. *Taylor v. State*, 840 N.E.2d 324, 329-30 (Ind. 2006). Regarding the final and critical ninth factor, a defendant must raise a strong presumption that the result at any subsequent trial in all probability would be different. *Reed*, 702 N.E.2d at 691. We analyze these nine factors with care because newly discovered evidence should be viewed with great caution and carefully scrutinized. *Taylor*, 840 N.E.2d at 330. The burden of showing that all nine requirements are met rests with the defendant. *Id*.

[15]  Of the nine factors that a defendant must show to obtain a new trial, McNary and the State focus on factors four and nine, with McNary contending that the newly discovered evidence is not merely impeaching and that there is a strong presumption that the newly discovered evidence would lead to a different result than the result in the first trial. *See id*.

[16]  As to factor four, McNary argues that the newly discovered evidence from the phone conversations is not merely impeaching because Taylor's statements during the phone conversations did more than show that the State pressured her to testify and reveal her motives to testify against McNary; they also show her

hope that testifying would help her get her children back from foster care. *Tr. Vol. II* at 158. Thus, McNary claims the phone conversations demonstrate that Taylor lied at his trial. As support for his contention, he notes that when he accused Taylor of lying during their phone conversations, she (1) did not deny lying and (2) did not respond by saying, "What I said was true." *Appellant's Reply Br.* at 7. McNary concludes, "[This] is not impeachment evidence; it is a recantment." *Id.*

[17] It was within the trial court's discretion to determine whether Taylor's statements during the phone conversations indicated that she had lied at trial. For example, when weighing Taylor's statement that the State was "kinda couching [sic] me about what I could and couldn't say" -- *Appellant's App. Vol. III* at 22 -- the trial court could have reasonably concluded that the State was not instructing Taylor to lie but was instead advising her to not testify about McNary's criminal record and other unlawful behavior. Indeed, Deputy Prosecutor Berry stated in her affidavit that she told Taylor not to speak about McNary's prior bad acts, criminal history, and law enforcement contacts. *Id.* at 103. Likewise, the trial court could have reasonably concluded that Taylor's explanation for why she testified against McNary did not indicate that she lied at trial. In response to McNary's questions about why she testified, Taylor responded, "Do you want me to look at my children through glass for ten years?" and "They were trying to hit me with ten years." *Id.* at 11, 12. The trial court could have reasonably concluded these statements simply revealed Taylor's motives for testifying, not that she lied at trial. If Taylor's motives for

testifying were self-serving, she was not the first, and will certainly not be the last, witness to testify for a perceived benefit, whether promised or not. The trial court was within its discretion to conclude that the phone conversations did not indicate that Taylor lied at trial.

[18] Moreover, even if the trial court should have concluded that the phone conversations established that Taylor lied at trial, Taylor's statements during the conversations were still "merely impeaching" and did not provide grounds for a new trial. Notably, "impeachment" is defined as "'[t]he act of discrediting a witness, as by *catching the witness in a lie* or by demonstrating that the witness has been convicted of a criminal offense.'" *Taylor*, 840 N.E.2d at 330 n.1 (emphasis added) (quoting Black's Law Dictionary 768 (8th ed. 2004)). Thus, when a person recants a previous statement, the new statement is merely impeaching and is not grounds for a new trial. *See McVey v. State,* 863 N.E.2d 434, 446 (Ind. Ct. App. 2007), *trans. denied.* In *McVey*, we determined that a molestation victim's affidavit contradicting her trial testimony was merely impeaching because it would "merely serve to cast doubt on [her] trial testimony [and] . . . place her credibility at issue." *See id.* Similarly, in *Lahr v. State*, we held that an affidavit by a prison trustee that he had lied at trial was merely impeaching and did not justify a new trial. 640 N.E.2d 756, 763 (Ind. Ct. App. 1994), *trans. denied. See also Abbott v. State*, 535 N.E.2d 1169, 1172 (Ind. 1989) (affidavit from accomplice's brother that the accomplice said that the defendant was not involved in the crime was merely impeaching and did not justify a new trial); *Chiesi v. State*, 644 N.E.2d 104, 107-08 (Ind. 1994)

(defendant was not entitled to new trial where witness did not directly recant trial testimony and the people who filed affidavits alleging that witness had lied were not disinterested but had their own interests in the outcome of the case), *abrogated on other grounds by Richardson v. State*, 717 N.E.2d 32 (Ind. 1990). Therefore, even if the trial court should have concluded that the phone conversations show that Taylor lied at trial, her statements during those conversations were merely impeaching and were not the basis for a new trial.

[19] We acknowledge that under some circumstances, Indiana's appellate courts have ruled that evidence showing that a witness lied is not "merely impeaching" and does justify a new trial. For instance, in *Wilson v. State*, we held that newly discovered evidence was not merely impeaching where the boyfriend of the victim executed an affidavit that recanted his trial testimony that he saw the defendant point a firearm at the victim; the evidence was not merely impeaching because the affidavit exposed the boyfriend to a potential perjury charge and was corroborated by two other affidavits. 677 N.E.2d 586, 588-89 (Ind. Ct. App. 1997). This new evidence was not merely impeaching because it "destroy[ed] or obliterat[ed] the testimony upon which the conviction was obtained." *Id*. at 588. In *Francis v. State*, the Indiana Supreme Court found newly discovered evidence did not merely impeach the victim's testimony because the new evidence was eyewitness testimony from two disinterested witnesses who placed the defendant away from the scene of crime, giving the new evidence "independent, probative merit of its own." 544 N.E.2d 1385, 1387 (Ind. 1989); *see also State v. McCraney*, 719 N.E.2d 1187, 1190 (Ind. 1999)

(co-defendant's recantation was not merely impeaching because it was free-standing evidence of the defendant's innocence). Here, however, Taylor's statements in the phone conversations did not "destroy" or "obliterate" her trial testimony. Her statements did not contradict or repudiate her testimony and, because the statements came from her and not a disinterested source, her statements did not have independent, probative merit. *See Wilson*, 677 N.E.2d at 588-89; *see also Francis*, 544 N.E.2d at 1387. Taylor's statements do not fit the criteria of the aforementioned cases where a lie or recantation was the basis to grant a new trial.

[20] McNary has failed to establish that Taylor's statements during the phone conversations were not merely impeaching and would have served as a basis for a new trial because of newly discovered evidence. A person seeking a new trial must satisfy all nine prerequisites for newly discovered evidence to justify a new trial. *See Taylor*, 840 N.E.2d at 330. In failing to demonstrate one of those prerequisites - that Taylor's statements were not merely impeaching - McNary has failed to meet his burden to show that he is entitled to a new trial. *See id.* at 329-30. Thus, the trial court did not abuse its discretion in denying McNary's motion to correct error and his request for a new trial based on newly discovered evidence.

[21] We note that McNary has also failed to establish a strong presumption that the result at a new trial would be different. *See Reed*, 702 N.E.2d at 691. The trial judge may consider the weight that a reasonable trier of fact would give the new evidence and evaluate its probable impact on a new trial in light of all the facts

and circumstances shown at the original trial. *Bradford v. State*, 675 N.E.2d 296, 302 (Ind. 1996). Here, Taylor's statements during the phone conversations shed light on her motives to testify against McNary. As the State observes, Taylor's reasons for testifying were already explored at trial, during direct testimony, cross-examination, and closing argument. *See Tr. Vol. II* at 144, 146, 158-60, 203-04. Moreover, it would have been reasonable for the trial court to determine that a jury in a second trial would give great weight to the affidavits executed by Deputy Prosecutors Renschler, Berry, and Doyle, which all asserted that Taylor was not pressured to lie and that they "coached" Taylor's testimony only to make sure that she did not testify about McNary's criminal record and other criminal activity. *Appellant's App. Vol. III* at 100, 102-05. We reject McNary's contention that introducing the statements Taylor made during the phone conversations would likely lead to an acquittal at a second trial. The trial court did not abuse its discretion in denying Taylor's motion to correct error and request for a new trial based on newly discovered evidence.

[22] Affirmed.

Pyle, J., and Tavitas, J., concur.